## THE PRESIDENT, DIRECTORS & COMPANY of the BANK of UTICA *against* PHILLIP WAGER.

Three things necessary to constitute usury; a loan, taking more than lawful interest, and a corrupt agreement.

ASSUMPSIT on a promissory note for 1000 dollars, against the defendant as maker, dated the 14th day of March, 1821, payable to the order of Sylvanus Smally, and Walter Beecher,

Taking the interest in advance, on discounting a note, is not usury; though it was formerly held otherwise.

But, *it seems*, this is confined to bankers, and those who deal in commercial paper by way of trade.

The cases upon the two last points considered.

A bank having established certain days for discounting notes, discounts a note at 90 days, taking the interest in advance. At the discount day nearest the day when the note falls due, but previous to the latter, the note is renewed, the interest being again taken in advance; and the note is renewed the same way a third time; so that for part of the time for which the notes run, interest is taken at the rate of 14 per cent. per annum, owing to a lapse of the notes. This is not usury, unless there was an agreement upon the first loan, either express or implied, that the note should be thus renewed, or it otherwise appears that the transaction was a cover for usury.

30 days after date, at the Bank of Utica, and discounted by the bank.

The cause was tried at the Oneida Circuit, in November, 1821, before his Honor, (the late) Mr. Justice Platt.

The plaintiffs proved the making and endorsement of the note, the amount of which, including interest to the 10th day of January, 1822, was $1039 86, and rested.

The defence was usury.

The defendants then proved that the note in question was the second renewal of a like note, which was made for the purpose of raising money by getting it discounting at the Bank of Utica; that all three of the notes were made for the purposes of discount, no consideration passing between the maker and endorsers.

Julius Augustus Spencer, a witness for the defendant, testified, that on the 15th of March, 1821, in behalf of the parties to the note in question, he carried it to the Bank of Utica, for the purpose of renewing a former note, and to pay the discount; that, on his presenting it at the Bank, some question arose among the officers of the Bank, whether the note could be renewed, the witness believed, on account of its not being a discount day; that one of the officers said he would go and see Mr. Hunt, the cashier, on the subject, and accordingly went out and shortly returned, saying that the cashier directed it to be done; that he then inquired how much he must pay for the discount? and was answered by one of the officers of the Bank, "18 dollars and 9 cents," which amount the witness paid, and received a like note, dated the 12 of December, 1820, and received no

In taking interest in advance on discounting a note, it is lawful to include the 3 days of grace in the computation.

To every practical purpose, the days of grace are a part of a promissory note.

But to take interest in advance upon discounting a 90 day note, calculated at $\frac{1}{4}$ of a year for 90 days, is usurious, and the note void.

Receiving usurious interest, intentionally, is sufficient evidence of a corrupt agreement.

The policy of the statute of usury vindicated.

Custom or usage will not be received to sanction usury.

A point once directly decided by this court, may be raised for the purpose of bringing a writ of error in another cause; but the court will not hear it argued.

*Lex mercatoria:* what: how proved. Authorities to these points collated. *Griffin,* counsel, *arguendo.*

*Custom and usage of trade.* What is a good custom or usage: manner of proving them for what purpose they are evidence: held not to sanction a penal offence. Authorities to these points collated. *Id.*

NEW YORK, money; that he did not object to the amount of discount
May, 1824. which was demanded; that he had at that time made no
Bank of Utica computation of the discount, and did not know whether it
v.
Wager. was too much or too little.

The defendant also proved that the two previous notes, of
which the one in question was a continuation, (the first dated
September 12th, 1820, and the second, December 12th,
1820, both corresponding, in all other respects, with the last,)
were successively discounted, at the same Bank, each for
the same sum of 18 dollars and 91 cents, and under circum-
stances, in other respects, similar to those, which attended
the discount of the last. The first note was discounted on
the 15th or 16th of September, 1820; and the second at the
day it bore date. The first note was drawn and delivered
to one Maynard, with a request to have it discounted for the
parties; and he procured it to be discounted accordingly.
He applied to have it discounted the 12th September, which
was denied on account of a formal objection to the note,
which was afterwards rectified.

A witness for the defendant testified, that he had made a
computation of the interest on the note in question, and that
the interest on 1000 dollars, for 93 days, is 17 $83\frac{1}{2}$, for 90
days, $17 26; for 89 days, $17 07; that the *discount* on the
same sum, for 93 days, is $17 52; for 90 days, $16 97;
and for 89 days, $16 78. The witness, on being requested
by his Honor, the presiding Judge, to explain what he meant
by discount in distinction from interest, stated, that it was
defined by Pike and Daboll, in their Treatises on Arithme-
tic, and as the witness understood it. Discount is an al-
lowance made for the payment of any sum of money before
it becomes due, or upon advancing ready money for notes,
bills, &c., which are payable at a future day. What remains
after the discount is deducted, is the present worth, or such
a sum as if put to interest would, at the given date and time
amount to the given sum or debt. The witness further sta-
ted, that, allowing each of the three notes to have run 93
days, the interest would have been $53 $50\frac{1}{2}$, and that the
Bank had taken too much interest, by 77 cents; that the
whole time from the 15th of September, 1820, the time

when the first note was discounted, until the note in question became mature, was 273 days; and that the interest for that time was $52 35; that the difference between that sum and $54 27, taken by the Bank, was $1 92; and allowing the Bank to take interest in advance, without regard to discount, and include the days of grace, and without regard to the time the notes had run before being discounted, or the lapse of the notes, the Bank had taken 25½ cents too much on each note.

Thomas Colling was then called, as a witness on the part of the plaintiffs, and testified that he was a clerk in the Bank of Utica, and had been for 9 years; that the note in question fell due on the 15th day of June, 1821; that the discount on the same is $18 09, and that sum was accordingly received for discount. The same drawer and endorsers had two notes previously discounted; the first note was dated the 12th day of September, 1820, and became payable on the 14th day of December, 1820. The second note was dated the 12th day of December, 1820, and became payable on the 15th day of March, 1821; and the note on which this suit was commenced, is dated on the 14th day of March, 1821, and became payable on the 15th day of June, 1821; that the first note was discounted on the day of its date, as appears by the books of the Bank, and passed to the credit of the defendant, and the money drawn out .r. his check; but the money was not drawn until three days afterwards, a proposition having been presented to the board of directors on the 12th of September, 1820, the date of the first note, to discount it, which was acted upon, and agreed to by the board as he then understood; and he was then told by the cashier, that such note had passed the board, and he was accordingly directed by the cashier to pay out the money whenever the note was presented. A second note was presented and discounted on the day of its date, the avails whereof were credited to the account of the defendant, and his draft for the proceeds received on account of the first note. The same sum for discount was received on this note as on the former. It appears by the books of the Bank, that the note on which this suit is brought, was discounted for the benefit of Sylvanus Smally, one of the en-

dorsers, and passed to his credit, and his check for the proceeds and some money were received on account of the second note; that there was an understanding when this note was presented, that (if discounted) the proceeds should be applied towards the payment of the former note. The discount received by the Bank on this note was also $18 09. It often happens, and is the ordinary mode of doing business, that the note in Bank is paid up before a new note is discounted.

The witness farther testified, that when a note is discounted, the amount is immediately deposited to the credit of the person for whose benefit the note is offered. When a note becomes payable on Thursday, which is not a discount day, a new note is generally presented on Tuesday previous, there being but two discount days in a week, viz. Tuesday and Friday; but if such note be discounted on Tuesday, the proceeds are placed to the credit of the person for whose benefit the note is offered subject to his draft, except in cases where there is an express stipulation at the time the note is presented, that the money shall be applied to the payment of some particular note. When, by any accident, it happens that a note is not presented on a discount day for which it was intended, the cashier is specially authorized by the board of directors, for the accommodation of the person presenting it, to discount the same as of the preceding discount day. The note upon which this suit is brought, was presented on Thursday, and discounted by the cashier on the special authority above stated. Notes are sometimes discounted before they are entered on the books, and, in this case, the books of the preceding discount day being closed, the note in question could not be, and was not entered upon the discount book till the following Friday.

He farther testified, that he did not know of any agreement to renew the first or second note: all the notes were discounted without any previous stipulation to renew them, to his knowledge.

He farther testified, that the duty of casting interest on notes, and keeping the discount book of the Bank, was assigned to him, and the proceeds of them were credited by him on the books of the Bank; that he has calculated in-

terest on all notes by the same rule, according to which the NEW YORK, interest was calculated on these notes, by first computing the May, 1824. interest at 6 per cent. for 90 days, at 15 dollars, and for the Bank of Utica three days of grace, one 30th part thereof or 50 cents, and v. then adding the 6th of that amount, $2 58⅔ for the other per Wager. cent. making in the aggregate, $18 8⅔,(1) without ever hav-

(1) The difference in the manner of casting, between the bank and the defendant, will be illustrated by the two following operations:

THE BANK.

$1000
    6

90 days=¼ of a year    4)60,00
3 days grace=$\frac{1}{30}$ of a mo.  30)15,00
        50

Obtain ⅙    6)15,50

which is    2,58⅔

which added to int. at 6 pr. ct. } 18,09 int. or discount for 93 days,
makes 7 pr. ct. int. or disc'nt. }    $18,09

THE DEFENDANT.

days  dolls.  days
365 : 70 :: 93
       70

365)65,10(17,83,5.   Int. or discount for 93
    365            days, $17,83,5.

    2860
    2555

    3050
    2920

    1300
    1095

    2050
    1825

    225

From bank discount } $18,09
deduct   defendant's }  17,83,5

Difference    .    25,5 for 93 days.

ing received any particular directions on the subject from the directors of the Bank; but that he had calculated interest as the cashier was in the habit of doing; and as he instructed the witness at the opening of the institution, having found the method in practice, the most easy and convenient.

He farther testified, that the interest on a 90 day note, like the present, is computed for 93 days, and amounts to $18 8⅔; but the interest received on this note, viz. $18 09, upon the mode of computation usual in banks, is a fraction, say ⅚ of a cent too much.

The counsel of the defendant objected to the competency of evidence to show the modes or customs of the plaintiffs, or those usual in banks or any association of men whatever, to justify the plaintiffs in taking more than 7 per cent. interest. But the Judge received the evidence subject to the exception.

The witness then further testified, that the whole amount of interest received on the three notes, is $54 27. The amount of interest at 30 days to the month, computed as above, according to the usage of banks, is $54 25. 1000 dollars for 93 days, at 365 days to a year, is $17 83½.

The witness then made the following calculations agreeable to the usage of banks, viz.: Interest on $1000 for three renewals, payable in 90 days from date, making the whole number of days 279, for which these notes ran including three days of grace to each note, is $54 25. The interest on the same notes for 94 days to each note, that being the time for which the parties to the notes had the use of the money, both days being included, making, in the whole, 282, is $54 83.

The witness further testified, that in cases where the Bank of Utica have had intercourse with the Banks of New York, where it was proper for them to charge 7 per cent. interest, they calculated interest in the same way; that the

Bank of Utica have had various transactions with other banks, in which the same mode has always been adopted; that if a balance is due from one bank to another, the way of calculating interest on such balance, would be to consider 30 the $\frac{1}{12}$ days of a year. This he believed to be the practice of all the banks in the state, as he found it to be so when he came into the Utica Bank, and has never discovered that it had been altered in any of the banks.

The witness, on his cross-examination, testified, that when a note was presented at the bank, to renew a former note, he usually wrote on the face of it, "*to pay* 1000," in red ink, or such sum as the former note amounted to; and that when a note was paid up by a renewal, there was usually endorsed on the back, "*Rd.*" or, "*Renewed.*"

The two first notes were then produced to him, and on the back of the first note, dated 12th September, 1820, was endorsed, "*Rd. Wm. B. Wells, Tellr.*" and on the face of the second note, dated 12th December, 1820, was written by the witness, "*to pay* $1000," in red ink; and on the back was written, "*Bank Rd. Wm. B. Wells, Tellr.*" On the face of the note in question, was written by the witness, "*to pay* $1000," in red ink.

The witness further testified, that in all the foregoing calculations by him, he had called 30 days a month, and 360 days a year.

A verdict was taken for the plaintiffs, by consent, subject to the opinion of the Court upon a case, and subject to all legal exceptions, on all points arising thereon, with leave to either party to turn the case into a special verdict.

The following calculations were furnished to the Court, on the argument, by the counsel for the defendant:

NEW YORK, May, 1824.

Bank of Utica v. Wager.

Calculation for 100 years, alluded to by Mr. Griffin *arguendo*.

| Y'rs. | Excess. | Y'rs. | Excess. | Y'rs. | Excess. |
|---|---|---|---|---|---|
| 1 | 972 22 | 33 | 115804 01 | 67 | 1281658 68 |
| | Int. .68 06 | 34 | 124882 51 | 68 | 1372347 01 |
| | 972 22 | 35 | 134596 51 | 69 | 1469383 52 |
| 2 | 2012 50 | 36 | 144990 49 | 70 | 1573212 59 |
| 3 | 3125 59 | 37 | 156112 04 | 71 | 1684309 69 |
| 4 | 4316 60 | 38 | 168012 10 | 72 | 1803183 59 |
| 5 | 5590 98 | 39 | 180745 17 | 73 | 1930378 66 |
| 6 | 6954 57 | 40 | 194369 55 | 74 | 2066477 37 |
| 7 | 8413 61 | 41 | 208947 64 | 75 | 2212103 01 |
| 8 | 9974 78 | 42 | 224546 29 | 76 | 2367922 44 |
| 9 | 11645 23 | 43 | 241306 75 | 77 | 2534649 23 |
| 10 | 13432 62 | 44 | 259170 44 | 78 | 2713046 90 |
| 11 | 15345 12 | 45 | 278284 59 | 79 | 2903932 40 |
| 12 | 17391 50 | 46 | 298736 73 | 80 | 3108179 89 |
| 13 | 19581 13 | 47 | 320620 52 | 81 | 3326724 60 |
| 14 | 21924 03 | 48 | 344036 18 | 82 | 3560667 54 |
| 15 | 24430 93 | 49 | 369090 93 | 83 | 3810886 49 |
| 16 | 27113 32 | 50 | 395899 52 | 84 | 4078620 76 |
| 17 | 29983 47 | 51 | 424584 77 | 85 | 4365096 43 |
| 18 | 33054 53 | 52 | 455277 92 | 86 | 4671625 40 |
| 19 | 36340 57 | 53 | 488119 59 | 87 | 4999611 40 |
| 20 | 39856 63 | 54 | 523259 96 | 88 | 5350556 42 |
| 21 | 43618 81 | 55 | 560860 38 | 89 | 5726067 59 |
| 22 | 47644 35 | 56 | 601092 83 | 90 | 6127864 54 |
| 23 | 51951 67 | 57 | 644141 55 | 91 | 6557787 28 |
| 24 | 56560 51 | 58 | 690203 68 | 92 | 7017704 75 |
| 25 | 61491 97 | 59 | 730490 16 | 93 | 7509916 30 |
| 26 | 66768 63 | 60 | 792246 69 | 94 | 8036592 66 |
| 27 | 72514 65 | 61 | 848676 18 | 95 | 8600126 37 |
| 28 | 78562 90 | 62 | 909055 73 | 96 | 9203107 44 |
| 29 | 85034 52 | 63 | 973661 85 | 97 | 9848297 28 |
| 30 | 91979 16 | 64 | 1042790 40 | 98 | 10538650 31 |
| 31 | 99389 92 | 65 | 1116757 95 | 99 | 11277328 05 |
| 32 | 107319 43 | 66 | 1196903 23 | 100 | 12067713 23 |

$120677 13 yearly average.

Difference in the operations of Discount and Interest.

| Am't. | Time. | Interest. | Disc't. | Difference. | Present worth less by disc't. | Present worth less by the Int |
|---|---|---|---|---|---|---|
| $1000 | 93 ds. | $17 83 | $17 52 | $0 31 | $982 48 | $972 17 |
| " | 1 year | 70 00 | 65 42 | 4 58 | 934 58 | 930 00 |
| " | 2 do | 140 00 | 122 90 | 17 10 | 877 10 | 860 00 |
| " | 3 do | 210 00 | 173 56 | 36 44 | 826 42 | 790 00 |
| " | 10 do | 710 00 | 411 70 | 288 23 | 599 30 | 290 00 |
| " | 14 do | 980 00 | 494 95 | 485 05 | 505 05 | 20 00 |
| " | 15 do | 1050 00 | 512 20 | 537 80 | 487 80 | 50 less than nothing. |

*Utica Bank* v. *Philip Wager.*

| | | |
|---|---:|---:|
| The plaintiffs loaned, | $981 | 91 |
| Interest thereon 3 months, | 17 | 18 |
| | $999 | 09 |

| | | | | |
|---|---:|---:|---:|---:|
| They, however, reserved in advance, | $ | 18 | 09 | |
| Interest thereon 3 months, | | | 31 | |
| Paid at the end of the term, | | 1000 | 00 | |
| | | $1018 | 40 | |

| | | |
|---|---:|---:|
| Difference excess, | $19 | 31 |
| | | 4 |
| Excess in one year on $1000, | $77 | 24 |

| | | |
|---|---:|---:|
| Annual excess on the Utica Bank capital, $1,000,000, | $77,240, | 00 |
| The bank has been incorporated 13 years, which gives to them of usury, | $1,004,120 | 00 |

$981 91 is loaned : no more is ever forborne.
68 73 interest thereon 1 year.

$1050 64 due to the plaintiffs at the end of one year.

By their method of doing business, they, however, get at the end of the year :

| | | |
|---|---:|---:|
| Principal, | $1000 | 00 |
| Paid in advance, | 18 | 09 |
| Interest thereon one year, | 1 | 27 |
| Paid at the end of 3 months, | 18 | 09 |
| Interest thereon 9 months, | | 95 |
| Paid at the end of 6 do. | 18 | 09 |
| Interest thereon 6 do. | | 63 |
| Paid at the end of 9 do. | 18 | 09 |
| Interest thereon 3 do. | | 31 |
| | $1075 | 52 |
| | 1050 | 64 |
| Difference, | $24 | 88 |

NEW YORK,
May, 1284.

Bank of Utica
v.
Wager.

*H. R. Storrs,* for the plaintiffs. We claim to recover on the following grounds :

1. The receipt of interest *in advance,* on the notes discounted, was not usurious.

2. The discounting of the 2d and 3d notes, *before* the 1st and 2d respectively *became due,* was not usurious.

3. There was no *corrupt contract* between the parties, for taking more than 7 per cent. The facts repel the idea of any *intention* to take illegal interest.

4. The *second note* dated December 12, 1820, fell due March 15th, which is strictly 3 calendar months and 3 days. This note is, therefore, not usurious on any principle. If, then, the last note were admitted to be usurious, the plaintiffs are still entitled to recover on the 2d note, *that* not being, in law, *paid.*

5. The second note of December 12th, was not given in pursuance of any original contract for usurious interest. There was no original agreement to discount a second note.

6. The mode of casting interest adopted was correct, and is not usurious.

7. The plaintiffs are entitled to recover on the money counts.

1. The right to take 7 per cent. by way of discounting a promissory note, is established by the *Manhattan Company v. Osgood.(a)*

(a) 15 John. 162.

2. We shall be told that discounting the 2d and 3d notes, before the 1st and 2d respectively became due, was usurious. In answer, we adopt the language of Eyre, Ch. J. in *Hammett* v. *Yea*(b) who puts this very case, " But," says he, " if part of the money were carried to the account of the borrower, though he did not mean to draw for it for some time, and did not actually draw for it till the whole time on the discounted bill was expired, no man would doubt of the fairness or lawfulness of the transaction ; and yet an interest is gained for the whole of that time, upon money not actually advanced." *Sewall, J.,* in the *Maine Bank* v. *Butts,*(c) speaks of this as the known and established course of banking business, and so far from being usurious, as constituting in connection with discounts, an important and acknowledg-

(b) 1 B. &
P. 154.

(c) 9 Mass.
Rep. 154.

ed source of profit, peculiar to this kind of institution. He describes this operation in the following language : " A borrower, who is unable to discharge his note at the expiration of the usance, or when the day of payment arrives, is under the necessity of preparing himself by requesting a discount of another note, which being to be presented on a certain day appointed for the business, the second discount is generally made some days before the preceding note is due ; and as the purpose is only the punctual payment of that note, the proceeds of the second discount are never drawn from the bank, which has the benefit of the deposit until the adjustment is made." If it had been a part of the original agreement, that successive notes should be discounted upon this plan, with a view to swell the discount, the transaction might have been usurious ; but nothing of that kind is pretended. It is the common case of one having money to pay ; and applying to a bank to furnish himself with funds for that purpose. The defence fails for the want of showing any corrupt agreement. The *Bank of Chenango* v. *Curtiss,*(d) is a much stronger case for the defendant. He agreed with the bank in that case, to deposit 2000 dollars, take a loan of $5000 and pay the interest on the whole 5000 dollars if it should return to the bank, still leaving his deposit there, and receiving nothing for it. This was holden not to be usurious, because the object of the agreement was fair ; and though more than legal interest might have been paid, if the contingency had turned out against the bank, the honest intent of the parties would prevent its being usury.

3. Our answer to the general objection, that more than legal interest has, in fact, been taken, is also founded on the total absence of any intention to violate the statute of usury. The casting interest for the 90 days, as the $\frac{1}{4}$ of a year, and for the 3 days of grace, as the $\frac{1}{10}$ of a month, and thereby gaining interest on the fractions which a subdivision of the year, at this rate, would produce, was the result of an arrangement made at the bank, for the mere purpose of convenience. The object was decimal simplicity of time, and no greater or less devisor would reach the actual period so nearly. There was no agreement between the bank and the defendant, that the note should be renewed at all ; much

NEW YORK
May, 1824.

Bank of Utica
v.
Wager

(d) 19 John
326.

less, that it should be renewed at a sacrifice beyond what was the legal interest. This error does not render the note usurious. We say error, because it is clearly such, in the calculation of time. If neither party contemplated usury, it cannot be so, and any other doctrine would be monstrous.

It cannot be necessary to read the act for preventing usury.(e) This act consists of two branches. The first forbids the taking or contracting for more than 7 per cent. per annum, for money or other thing lent and declares all bonds, bills, notes, contracts and assurances whatsoever, &c., for securing more, to be utterly void. The second branch imposes the penalty of refunding the excess. This penalty attaches by the very terms of the act, whether the excess be received corruptly or not; but the greater penalty imposed by the first branch, the forfeiture of the contract, is not incurred, unless a corrupt agreement is proved to have been made at the time of the loan. If pure in its origin, 50 per cent. or any greater sum, may be afterwards taken, and it does not avoid the contract, though the second branch of the statute very properly requires that it should be refunded. Error is not enough. If the bank, then, have received too much, let the defendant resort to the proper remedy, which is an action for the excess. This is all he can do.

All the authorities concur, that to avoid the contract, the agreement must be corrupt. The true distinction is laid down by Twisden, J. in *Rex* v. *Allen*,(f) that "if the party who lends the money, contracts for more than £6 per cent. all the assurance is void, but if he doth not contract for more than the statute allows, and afterwards he will take more, the assurance shall not be avoided, but the party shall forfeit the treble value." The forms of pleading furnish the most accurate test of principles. The manner of pleading usury, in avoidance of a contract, is always, "that it was corruptly, and against the form of the statute in that case made and provided, agreed by and between the said A. B. and the said C. D." that the former should lend and forbear, and that the latter should give and pay the usurious rate of interest ;(g) to which

(e) 1 R. L. 64.

(f) T. Raym. 196.

(g) 2 Chit. Pl. 467, and vid. *Farrel* v. *Shaen*, 2 Keb. 525. *Dande* v. *Curser*, id. 35. *Hinton* v. *Roffe*, 2 Show. 329. *Swailes* v. *Bateman*, Sir W Jon. 409. Vide also 1 Keb. 629 Ord. 92.

the replication is, that the contract "was made by the said C. D. for a good and legal consideration, and not in pursuance of, or upon the said corrupt and unlawful agreement, or for the purpose in the plea of the said C. D. mentioned, in manner," &c.(*h*) There is not a doubt about the law, if these well established precedents are correct. The issue is always directly upon the corrupt agreement.

Thus in *Button* v. *Downham*,(*i*) which was debt on bond conditioned to indemnify against another bond wherein the parties were bound to one Wolmer, &c., the defendant pleaded the statute of usury, and that it was *corrupte agreatum*, between him and Wolmer, that the defendant, for the forbearance of £20 for a year, should give to Wolmer £10, if A., his son were then alive, and that the obligation was made for that cause, and so void, &c. Upon demurrer, it was insisted that this was not usury, it being upon a contingency; but three of the Justices of the Common Pleas held it to be usury; " for the corrupt agreement (which is confessed by the demurrer) makes it usury, *and it is the intent makes it to be so, or not so.*"

It may be true that an agreement to take beyond the legal interest, wholly unexplained, will be intended usurious. But here the circumstances explain fully the manner in which it happened. The English statute of usury expresses a distinction much like that for which we contend. It contains a proviso,(*j*) that the act shall not extend to " covenants made upon a just and true intent had between the parties." Our statutes were re-enacted and continued down from the English by revisals from time to time, all being *in pari materia*, and the whole should be construed together. Indeed, there never has been any dispute about the construction, that there must be, in fact, a corrupt agreement.

In *Hammet* v. *Yea*, the defence was usury, and Rooke, J. said,(*k*) he could not but consider the defence in the same light as he thought a proceeding on the other branch of the statute, and thought the transaction entitled to as favorable construction, as if it were the subject of a penal prosecution; and Eyre, C. J. has explained and elucidated this whole doctrine in the same case.(*l*) " I repeat," says he, in conclusion,

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager

(*h*) Id. 616
*Joy* v. *Kent*.
Hardress, 418.
Jenk. cent. 2,
case 70, p. 87,
88. *The King*
v. *Arden*, 3
Bulstr. 71, per
Coke, Ch. J.
(*i*) Cro.
Eliz. 643
Moore, 398, S.
C. called *Button* v. *Droman*,

(*j*) 37 H
8, ch. 9, s. 6.

(*k*) 1 B. &
P. 156.

(*l*) Id. 151
154.

NEW YORK, "that I cannot agree, that in usury, more than in any other
May, 1824. case, the whole transaction is not to be taken together; that
Bank of Utica it is not to be analyzed and reduced to all the parts of which
v. it is to be composed, and to all the conclusions of fact which
Wager. fairly result from the whole of the evidence, and that the law
does not arise from a fact, so considered. Whether more
than 5 per cent. be intentionally taken for the loan and for-
bearance of money, is a question of fact to be decided by the
jury." It was maintained in that case, as in the present, that
a certain set of facts were, *per se*, usurious, but the whole
Court repel that idea throughout the case. The reasoning
of Eyre, C. J. is adopted by Spencer, C. J. in *Stewart* v. *Me-*
(m) 19 John. *chanics' & Farmers' Bank*,(m) who declares, that in that, as
508. in every other case, where the question of usury is raised,
all the facts and circumstances are to be taken into view.
This is but a reiteration of the doctrine well established be-
fore, from the earliest cases down to *The Bank of Chenango*
(n) 19 John. v. *Curtiss*.(n) Gould, J. in *Murray* v. *Harding*,(o) says,
326. "the ground and foundation of all usurious contracts is the
(o) 2 Bl. corrupt agreement." The excess should be made a condition
Rep. 865.
(p) Hine v. of the loan ;(p) and so essential is the corrupt agreement
Handy,1 John. deemed, that even in Chancery, where pleading is stripped
Ch. Rep. 6. of form and reduced to its essential principles, it is usual to
plead the agreement in terms, and to aver that it was cor-
(q) Stewart rupt.(q) In *Eagleston* v. *Shotwell*,(r) it was made a condi-
v. Mechanics
& Farmers tion of the loan, that the borrower should take part in insu-
Bank,19 John. rance stock, above its value in the market, and the decision
500.
(r) 1 John. proceeded upon this ground. The decision in *Thompson* v.
Ch. Cas. 536.
(s) 3 Id. 395. *Berry & Van Beuren*,(s) was founded on open exaction.
(a) Doug. The case of *Lowe* v. *Waller*,(a) was considered upon all its
736. circumstances; the question of usury was referred to the ju-
ry, who found that there had been usury, and on a motion
for a new trial, Ld. Mansfield said, " the only question in all
cases like the present is, what is the real substance of the
transaction, not what is the color and form." So, in *Dun-*
*ham* v. *Gould*,(t) the jury were charged, " that if they be-
(t) 16 John. lieved the exchange of notes to have been for the purpose
367. of raising money at a greater rate of interest than 7 per cent.
per annum, which they were warranted to infer from the evi-

dence before them, then the transaction was usurious," thus putting the usury upon the intention and purpose of the parties. The opinion of the Chancellor in that case,(*u*) goes upon the same principle. In *Spurrier* v. *Mayoss*(*v*) Ashhurst, commissioner, says, " my first impressions have been altered by the arguments and the facts of the case. To make the contract usurious, it must be apparent, either upon the face of it, or by evidence, that the intention of the parties in the creation of it, was, by means of shift or device, to take more than legal interest for the loan or forbearance of money." In *Tate* v. *Wellings*, Buller, J. says, " here the defence set up is, that the contract itself was illegal, and in order to support such a defence, it must be shown that it was usurious at the time when it was entered into, for if the contract were legal at that time, no subsequent event can make it usurious." *Thompson* v. *Thompson*,(*w*) was the case of an usurious agreement at the time, and in *Thompson* v. *Woodbridge*,(*x*) the Court lay down the distinction for which we contend, in terms, that " where usurious interest is not originally contracted for, but is afterwards received, the party receiving it is subject to the penalty provided by the statute, but the note, or other security, is not avoided." So, per Ld. Mansfield, in *Abrahams* v. *Bunn*, (*y*) " there may be usury which cannot affect the debt or avoid the contract. The clause that avoids the contract, is where the contract is for more than 5 per cent." Courts of Equity refuse to lay down any general rule, but always put themselves upon the circumstances of each case, on the question whether there be a shift to evade the statute.(*z*)

The *Maine Bank* v. *Butts*,(*a*) will, doubtless, be loudly appealed to ; but, upon examination, will be found, instead of sustaining, to defeat the defence. How that case was decided, on being finally submitted *to a jury, does not appear,* but admit that it was a case of usury : the company had discounted for three years, a series of small notes given to secure the interest semi-annually, on two large notes, one payable in two, and the other in three years. The transaction was usurious on its face. The bank took the notes with a knowledge of the excess, under the idea that they were pri-

NEW YORK, May, 1824.

Bank of Utica v. Wager

(*u*) Id. 374.
(*v*) 1 Ves Jun. 533.

(*w*) 8 Mass. Rep. 135.

(*x*) Id. 256.

(*y*) 4 Burr. 2253.

(*z*) 1 Mad. Ch. 241
(*a*) 9 Mass Rep. 49.

vileged.  The Court repel the idea of privilege, and at the conclusion, they state the very case under discussion, and distinguish it from the one which they decide.  "The mistake," say they; "was not involuntary, as a miscalculation might be considered, where an intention of conforming to the legal rule of interest was proved; but a voluntary departure from the rate.  An excess of interest was intentionally taken, upon a mistaken supposition that banks were privileged in this respect to a certain extent.  This was, therefore, in the sense of the law, a corrupt agreement, for ignorance of the law will not excuse."  But it will be seen, by a remark just before the one quoted, that strong as that case was, the Court would not be understood as deciding that it was one of usury.  "How that is in the case at bar," say they, "we are not called upon to decide at this time, but we are all of opinion, that the defendant is entitled to a new trial."  Why? because, as will be seen by the case, the Judge did not submit the question to the jury; so that both in its reasoning and result, that case comes to the very point for which we contend.  The Court distinguished carefully, lest counsel should dream of a mistake being usurious.  "That," say the Court, "was a voluntary contract."  Not so, in the case under consideration.  All business is done in the Utica Bank at 7 per cent. and the Clerk has merely discounted by an erroneous rule.  There is nothing about this excess in the original contract, as there was in *The Maine Bank* v. *Butts*.  No terms are specified; every thing passes on in silence, an of course.  The Clerk says, he reserved the $18 09 to the Bank, as the discount.  This is now complained of as *erroneous*, but that does not make it usurious.  It was not complained of, nor even noticed or thought of at the time.  No excess was understood to be reserved for the loan, which is essential to constitute usury.(b)

*Buckley* v. *Guildbank*,(c) is a strong case that a mistake will not amount to usury.  In that case, it was found by special verdict, that the agreement was to lend £120 for a year, at legal interest.  The agreement was made the 23d of May, 1617, and a bond was drawn by a scrivener, dated that day, by which the defendant became bound to pay £132, upon

(b) *Clayton's case*, 5 Rep. 70.
(c) Cro. Jac. 678.

the 24th of May next ensuing, which some of the Court allowed might refer to the same month of May in which the bond was dated, which would make it usurious if unexplained; "but they all held," says the book, "although it should be expounded to refer to May 24th, the same month and year, which is the next day, as it was in *Prescot's case*, (Cro. Jac. 646,) yet forasmuch as the agreement is found to be to make the loan for a year, and that the assurances were for the payment at the end of the year, and by the *scrivener's* mistake is made payable the next day, it is not usury within the statute ; for there was not any corrupt agreement betwixt them, but a true and absolute agreement." It will be seen also, by Wood's Institutes of the Laws of England,(d) a book remarkably correct in its definitions, that usury implies a gain by contract, in consideration of the loan ; but there can be no contract unless the subject is understood, and the minds of the parties meet upon the terms of the loan. In *Reynolds* v. *Clayton*,(e) Drew, sergeant, *arguendo*, mentioned the case of one Becher, adjudged in the King's Bench, who delivered wares of the value of £100, and took an obligation to re-deliver them in one month, or pay £120 at the end of the year, which was holden usury ; but the Court replied that this must depend upon the intent with which the contract was made. In *Crow* v. *Brown*,(f) judgment was given for the plaintiff, on a bond, upon demurrer to a plea of usury, because it was not said that the defendant was indebted to the plaintiff at time of bond given, or that there was an agreement to lend money upon the usurious contract ; and *Rex* v. *Ward*,(g) *Turner* v. *Hulme*,(h) *Dagnall* v. *Wylie*,(i) go also upon the ground of agreement. In *Murray* v. *Harding*,(j) De Grey, C. J. enters into a full commentary upon the previous cases which relate to this point, and reduces them all to the question, whether the contract be made in good faith, and Gould, J.(k) uses a very strong expression to the same purpose. Within the spirit of all these cases, if the contract with the bank was *bona fide*, if no usury was intended, there is no usury. As the Court remark in *Buckler* v. *Millerd*,(e) "it depends upon the agreement, and the party may show any thing to make it appear there was no corrupt agreement." The au-

NEW YORK, May, 1824.

Bank of Utica v. Wager.

(d) p. 432

(e) Moor 397, 398.

(f) 12 Mod 385, and vid 1 Leon. 96.

(g) 12 Mod 517, per Holt C. J.
(h) 4 Esp Rep. 11.
(i) 2 Campb 33.
(j) 2 Bl Rep. 862, 3.
(k) Id. 865.

(e) Ventr 107, 8.

NEW YORK, thorities, both ancient and modern, speak a language on this
May, 1824. point too uniform and plain to be mistaken. To the other
Bank of Utica authorities, may be added what was said in *Watkins* v.
v. *Taylor*.(*f*)
Wager.

In Jenkins, (Cent. 2, case 70, p, 87, 88,) it is said that the
(*f*) 2 Munf. intent is traversable; that an act of parliament may make
Rep. 438, 9, & the intent issuable, and the case of a corrupt loan under the
vid. 1 Bulstr. statute of usury, is put by way of illustration. If so, and
17. there is any thing in the maxim, that pleading is an index
to the law, the corrupt intent must appear. We cannot
know the agreement unless we look at the intention. This
the essence of every contract, as well as of every crime.
There must be a criminal intention, or there can be no guilt,
Upon any other principle, the statute will operate as a snare,
in which the artful and designing may entrap their neigh-
bors, by setting up and establishing usury, where none was
ever intended.

4. Thirty days being called a month in the calculation
of the Clerk, it will be said this gives an excess of 5 days in
the whole; but it will be found, according to our fourth
point, that there was no excess of time in calculating for the
second note. There was a full allowance on this of three
calendar months and three days. Admitting that there is in
the other an usurious difference between 90 days and 3
months, the objection has no application to this note, upon
which we are entitled to recover, the same as if the time had
been expressed in months instead of days. If the last note re-
ceived in payment for the second, be void for usury, the sec-
ond remains due, and we may recover upon this. The au-
*Gray* v. thorities are abundant, that where a contract is valid original-
, 1 H. ly, a security for the money due upon it, taken afterwards but
} *Fer-* void by the statute of usury, leaves the original contract in
. *Shaen,*
nd. 294. full force and effect.(*g*) The second cannot be connected with
v. *Ma-* the first, which was a distinct and independent contract.
9 John. Each of these notes are, in fact, a consideration for a dis-
47, 150. tinct loan.
*ild* v.
nd, 6 In *Callcott* v. *Walker*,(*h*) it appeared that the plaintiffs at
24. law acted as bankers, and at the end of every quarter struck
*ns* v. a balance, in which was included the principal money ad-
*yne,* 3 vanced by them, all interest then due upon it, and a com-
*i.* Rep.

2 Anstr.

mission of 5 shillings for every £100 advanced : this balance was, at the end of every quarter, converted into principal, and carried interest ; this the defendant at law contended to be usury, and insisted upon having an injunction continued against the plaintiff's proceeding at law. The Court were of opinion that it was not usury ; and they declared, that " the custom of the place and the practice of the parties being to strike a balance at these periods, brings it to the case of a fresh agreement, at the beginning of each quarter, to lend the sum so due." It will not, then, we trust, be insisted, that these different discounts were all parts of one continued entire contract ; for each was, in fact, a new loan. If the first agreement was usurious, the Court will regard it as a nullity, but they will not travel about to seek for grounds of connecting it with a subsequent act, in order to overthrow that also. The second note may well stand independent of the other. Every presumption should be against usury or other illegality, and in favor of a contract entered into by parties fully competent to contract. We do not live in the age of the writ *de hæretico comburendo.* The statute is to receive its fair construction, and while on the one hand, the Court will guard against the shifts and evasions by which usurers may seek to avoid it, they will never extend its provisions to an honest man who has no intention to violate it. The second note was not given in pursuance of any contract at all, beyond a bargain for a fair loan at the time. The preceding note cannot be called in as a consideration. The Court will not connect it with the second, unless this was done by the agreement of the parties. A continuation is not to be presumed. The second was a distinct discount of a new note.

6. But the mode of calculation was correct. If the objection be true as to months, it is so as to days. Who ever heard, that in fractions of a month, days are not always taken in a ratio to 30 ? This is the rule of all mankind, to which the Court may look as to the common usage ; and of which they may (according to the practice of Ld. Mansfield) inform themselves at their chambers, by inquiries of bankers. No other rule ever prevailed. Will the Court go into

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

NEW YORK, a minute examination, to see on which side some small frac-
May, 1824. tions may lie upon a cast of interest? Suppose a note dated

Bank of Utica the 1st of February, and payable the 1st of March, on which
v. a month's interest is taken, though but 28 days have elaps-
Wager. ed. If you examine at all, you must go back to the con-
tract. Here is more than 7 per cent. On a similar note,
dated the first of May, and payable the first of June, and
a month's interest taken, the fraction would be against the
payee, yet such a difference was never regarded by any
human being. The Court are called upon to overturn a
practice which prevails throughout the commercial world.

We agree that no custom shall control the statute of usu-
ry; but it is allowed to control as to the manner of com-
putation under the statute. Even by the rule of casting in-
(i) Connecti- terest in Chancery, a little more than 7 per cent. is given.(i)
cut v. Jackson, Such is also the rule of this Court. The trifling fluctu-
1 John. Ch.
Rep. 17, 18. ations of $\frac{5}{12}$ of a day, or other small fractions of time, be-
tween debtor and creditor, never present the grave question
of usury. They rest on mere convenience of calculation.
Perfect accuracy is unattainable in practice. The search is
after the most equitable rule. Does not the principle of
calculation, adopted by banks, give the most equitable re-
sult, consistent with reasonable facility in doing business of
this nature?

(j) Booth v. Such a practice is untouched by the statute of usury,
Cook, Freem.
264. Nevison either upon the principle of mistake, or the absence of any
v. Whitley,
Cor. Car. 501. corrupt agreement, according to the cases already cited and
Livingston v. others ;(j) or upon the settled usages of trade within the
Bird, 1 Root,
303. Orr v. case of Floyer v. Edwards.(k) The language of Ld. Mans-
Churchill,1 H.
Bl. 232, per field, in the latter case, goes directly to the present. "What,"
Ld. Lough- says his lordship,(l) "are the terms of the contract? Are
borough.
Buckley v. they any new fangled terms? So far otherwise that the
Guildbank, agreement barely cannot be called an universal practice;
Cro. Jac. 678.
Smith & Wil- yet it is the general practice of the trade. It is true,
son v. Beach, the use of this practice will avail nothing, if meant as an
3 Day's Cas.
268. Ord on evasion of the statute, for usage certainly will not protect
Usury, 38.
(k) Cowp. usury. But it goes a great way to explain a transaction;
112. Lofft, and in this case is strong evidence to show that there was no
595, S. C.
(l) Id. 115. intention to cover a loan of money. Upon a nice calcula-

tion, it will be found that the practice of the Bank in discounting bills, exceeds the rate of five per cent.; for they take interest upon the whole sum for the whole time the bills run, but pay only part of the money by deducting the interest first; yet this is not usury."

*J. A. Spencer*, contra. The defendants claim the judgment of the Court on the following grounds;

1. It was *usurious* for the plaintiffs to take interest for the time the first and third notes had run, before being discounted by them.

2. It was *usurious* for them to take interest on the second and third notes, when presented for renewal of the first and second notes, for the time they had already received interest on those former notes.

3. It was *usurious* for them to take interest in advance for the days of grace.

4. It was *usurious* for them to take interest in advance without regard to the rules of rebate or *discount*.

5. It was *usurious* for them to take *over seven per cent. interest in advance*, by shortening the year, thereby raising the rate.

On a full development of this case, it will be seen that there is not only usury here, but that the plaintiffs have pursued a systematic course of usury for a series of years, and to an immense amount. I admit the principle established in *The Bank of Chenango* v. *Curtiss.(m)* It is no doubt a correct general rule, that where the receipt of more than 7 per cent. is, by the agreement, to depend upon a contingency, it is not usurious; nor do I question that the security objected to for usury, must be contaminated with it in the outset. If then pure, no subsequent act of usury can corrupt it. Another position is conceded; that where a security is taken for a loan pure in its origin, and afterwards an usurious note is taken, as a substitute for the first, the latter is void, and the first security remains in full force. I also admit that to constitute usury, the excess must be taken or contracted for intentionally, with the qualification that there may be a legal intention as contradistinguished from an

*(m)* 19 John.
326.

actual one.   If the whole be matter of mere mistake or mis-calculation, the security will not be avoided.   If the parties intend to confine themselves to a correct rule, but by a mere error in adding, substracting, &c., more is received or finds its way into the contract, this will not vitiate it.   So of a mistake in counting money, as calling a 5 dollar bill 3 dollars, and thus receiving 2 dollars excess.   There can be no dispute about such mistakes.   They are not usury, *per se.*

With these concessions, we have very nearly disposed of all the cases which have been quoted ; and if we cannot distinguish our cause from them, we cannot, with any confidence, ask a judgment for the defendant.

The amount involved in the decision here, is a mere trifle when compared with the consequences which are to follow it.   In the latter point of view, the question is no less than whether this company are by their charter absolved from those legal restraints which bind individuals, whether they have a right to rise above the laws of usury, and take what interest they please.   In the very act creating them,(n) they are placed in a situation subordinate to the laws of this state and of the United States ;  and the rate of interest is declared only as to notes at 60 days.   They are then subject to the statute of usury.

(n) Sess. 35.
ch 64, s. 5.

This was accommodation paper, one note being received in substitution for another, in the ordinary course of bank business.   The whole was one continued transaction, like that in *Powell* v. *Waters ;*(o) the 2d and 3d notes being mere renewals of the 1st and 2d ; and it follows upon one of the principles conceded in the argument, that if the first note was void, the others are equally so.

(o) 17 John.
176.

1. As to the first and last notes, they were both discounted after their respective dates.   We ask, then, what right had the plaintiffs to demand interest for the time which the notes had already run ?   If it was usurious to receive an excess of interest for 30 days, or for a longer term, it was equally so to receive it for one day as on the last note, or 3 days as on the first.   The authorities establish beyond all question, that an accommodation note, discounted at more than the usual rate of interest, is usurious.   In *Mann* v. *The*

*Commission Company,*(p) Spencer, J. in delivering the opinion of the Court, says, " I take it to be clear, that if a bill or note be made for the purpose of raising money upon it, and it is discounted at a higher premium than the legal rate of interest, and where none of the parties whose names are on it can, as between themselves, maintain a suit on the bill when it becomes mature, provided it had not been discounted, that then such discounting of the bill would be usurious, and the bill would be void." The same point is decided in *Powell* v. *Waters,*(q) and *Bennet* v. *Smith.*(r) Will this also be put on the ground of unintentional error? The business was done by a Clerk of the bank, an officer who, I believe, is seldom found to mistake a day.

3. This was either a calculation of interest on the first and last notes, for a time which they had already run, or (upon the principle that the whole was a continued transaction) it was doing what is equivalent to the objection in the first point, by taking interest on the 2d and 3d notes when presented for renewal, for the time the bank had already received interest on the two preceding notes. The 2d note was presented at the end of 87 days, from the time the first was presented. Upon this 2d note, they take 90 days interest, having before taken interest for the same time on the first. Had the second note been presented at a different institution, it would have been another thing ; but here they were entitled to nothing but the legal discount for the time which run on in the course of these renewals. What authority had they thus to receive 14 per cent. for several days of that time ? Will the Court screen them by calling the second note a new loan ? It is plainly but a continuation of the former, and nothing less than 14 per cent. for a part of the time. So as to the 3d note.

3. I have not been able to find an adjudged case in which interest is allowed for the three days of grace. These are matter of grace or indulgence to the defendant. Blackstone says that our sturdy ancestors would not submit to be holden punctiliously to the precise day of payment ; they could not be turned so shortly round, and, therefore, these days

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(p) 15 John.
55, 6.

(q) 17 John.
176.
(r) 15 John
Rep. 355

NEW YORK, were allowed.(r)    It is true that in *Brown* v. *Harraden*,(s) May, 1824. it was decided that a suit could not be commenced till after _____ these days had expired ; and Lord Kenyon intimates that in-

Bank of Utica
v.
Wager.

terest may be claimed for them ; but if this be admitted, it does not follow that it may be taken in advance.    Suppose

(r) 3    Bl.
Com. 277, 278.

a note at 30 days with interest ; and that on the 30th day,

(s) 4 T. R.
148.

the maker should tender the whole sum due, could the payee refuse, unless interest were also tendered for three additional days?    If the payee could not force the days of grace upon the maker, he cannot exact interest.    There is no case upon this question, except *Brown* v. *Harraden*, and there the remark of Ld. Kenyon was entirely *obiter*, and made after he had disposed of the only real question in the

(t) 1 B &
P. 144.

cause.    Nothing is said of this in *Hammett* v. *Yea*,(t) where in other respects the calculations were extremely nice to make out usury.    All the elementary writers who assert that interest may be claimed for the days of grace, refer to what was said in *Brown* v. *Harraden*.

4. We are aware that the *Manhattan Company* v *Osgood*, relied on by the plaintiffs' counsel, does decide that taking the interest in advance is not usurious.    One word as to this case.    It is new.    No other decision has been made directly on this question.

[*Woodworth, J.*  It is, notwithstanding, an authority here by which we are bound.]

*Spencer.*    A writ of error is brought in that cause.

[*Woodworth, J.*  That makes no difference.    The decision is in point ; and, till reversed, we must abide by it.]

[*Sutherland, J.*  There is but one way of questioning our opinions upon a point directly involved in the cause decided.    That is by bringing a writ of error.    If we sit to hear them questioned in this Court, there is nothing settled by any decision which we can make.    On a point incidentally decided, it might be different.]

*Spencer.* It was necessary to raise the point here in order to avail ourselves of it upon error, should the Court be against us.

[*Savage, Ch. J.* You are undoubtedly right in raising the question, but a majority of the Court are decidedly against hearing it argued.]

*Spencer* proceeded to the 5th point.

5. This relates to the question of intention, and the force of usage. If one, on loaning money, take more than 7 per cent. at the time of the loan, the law will fix the intent. The bank clerk says, that Hunt, the cashier, ordered him to discontinue the calendar year, and calculate by the rule adopted in relation to these notes ; and that he had done so ever since he came into the institution. Was either the cashier or the clerk ignorant of the consequences which would follow ? The almanac is a part of the law of the land,(*u*) and every one will be presumed to understand it. If the conventional standard take more than 7 per cent. the law will imply intention and corruption. A loan is for a year's per cent. or more, or less. The parts of a year are in question. The statute does not mention months, or any term short of a year. It speaks of a loan *for a year*, or, *a longer or shorter time*, The necessity of resorting to months, upon principles of convenience is denied. The legislature knew that interest could be computed by years and days with perfect ease. Why then resort to months ? The answer given by the plaintiffs is, that they have been guilty of taking interest in this manner for more than 10 years, and that their neighbors are as guilty as they are.

(*u*) *Domina Regina* v. *Dyer,* 6 Mod. 41, per Holt, C. J
*Brough* v *Perkins,* Id. 80, 81, per Holt, C. J.

In *Marsh* v. *Martindale*, Ld. Alvanley, Ch. J. gave his opinion, in terms, " that if a man agree to take more than 5 per cent. for the forbearance of money, the law declares that such an agreement is corrupt, within the statute of Anne, whether the party thought, at the time, that he was acting contrary to the statute or not." That case was a bill of exchange for £5000, for which a bond was substituted, payable at 3 years, and £750, the precise legal interest, was

NEW YORK,   taken in advance.   All the points decided were material to
May, 1824.   the present case.   The first was, that taking interest in ad-
Bank of Utica   vance is usury : 2. That taking more than legal interest on
v.   a loan, in any case, is usury : and 3. That this is a question
Wager.   of law.   "And though (says the Ch. Justice) the jury have
found that Sir Charles Marsh did not think that he was acting
contrary to law, there is nothing in that finding to prevent
us from examining the transaction, and declaring it to be
corrupt, *if it appear to us to be so in point of law* without
sending the case back to a jury to find the corruption."

The custom relied on must be very limited.   The Court
will see, by an examination of our bank charters, that they
are rarely authorized to take more than 6 per cent. interest.
This usage could not have existed any where in the state,
till this bank was chartered, 13 or 14 years ago.   The usage
of shortening months, &c., must have been confined, before
this to discounts at 6 per cent. which would not have reach-
ed the sum allowed by the statute of usury.   There is, then,
no usage to influence the case.

But if there were usage, I deny its force when set up to
control the statute of usury.   I do this on the authority of
(v) 16 John   *Dunham* v. *Gould,*(v) decided by the Court of Errors, in
367.   which the late Chancellor examines all the cases upon this
point, and shows that they rest upon distinct principles.   Sup-
pose a loan of $1000, at 3 years ; and 3 separate notes, at 3
years, given simultaneously for the interest, these three notes
also drawing interest.   This transaction is reached, exactly,
(w) 9 Mass.   upon banking principles.   Such was the case of the *Bank of
Rep. 49.   Maine* v. *Butts.*(w)   $10,000 were loaned—4000 for 2
years, and 6000 for 3 years—and small notes, dated at the
same time, and payable at 3 years, were taken on interest to
secure each accruing years' interest upon the large notes.
This was holden usurious ; and the Court adopt the sensible
distinction between a mere miscalculation, and an intention
to compute by a usurious rule.   Have the plaintiffs shown
any mistake in their arithmetical calculations ?   No.   They
understand themselves perfectly.   They are right through-
out, in fractions of years, months, &c., and the result is cor-
rect.   I hope the Court will keep in view the difference be

tween a mere mistake of a figure, a miscalculation, and the voluntary application of a mistaken rule. In the latter case it is usury. It cannot be excused by the force of usage, or any other pretence. Suppose the merchants of a city should all lighten their weights, and contract their yards, could they shelter themselves under this usage, of their own creation, from the penalties inflicted for selling by false weights and measures ?

The agreement may be perfectly pure ; yet if more be taken than 7 per cent. as a premium for the loan, by force of any pretended rule or custom, it is void.(x)

If the bank retained more than 7 per cent. knowingly, it was usury, though Wager did not know it. It is enough that the party who makes the loan understands the subject. The authority to the agent was, to pay what was demanded upon the third note. This was done. The bank demanded $18 09, and it was paid accordingly. The agent meets the proposition made by the bank. Usury never could be reached, if the counsel are allowed to refine away this case by saying that the bank acted without an usurious intent. It might as well be said they could have no criminal intention, because (being a corporation) they had no soul.

*E. Griffin,* (same side.) It will be recollected, that the sum of $18 09, was taken for interest *only.* Here, then, is a case where an incorporation, created for the purpose of loaning money, and subject, like an individual, to the operation of the statute to prevent usury, have thought proper, deliberately, intentionally, and for years, to take over seven per cent. per annum. One would suppose, that the bare statement of facts would be a sufficient answer to all that has been, or can be said in justification of the practice adopted by the plaintiffs.

The statute of usury declares,(y) " that no person or persons, whomsoever, shall hereafter take, directly or indirectly, for the loan of any moneys, &c., above the value of £7, for the forbearance of £100 for one year ; and so after that rate, for a greater or lesser sum, or for a longer or shorter time." All notes, &c., for the payment of any principal or

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(x) *Fisher*
v. *Beasley*
Dougl. 235
Com. Dig
Usury, (A.)

(y) 1 R. L
64, s. 10.

money lent, &c., are, by the same action declared utterly void. That the plaintiffs have taken more than at the rate of £7 in the hundred, for the loan, is proved by their own clerk, who was instructed, by the cashier of the institution, to receive it. It further appears, that they have taken interest in the same way for more than nine years. The statute declares the note *void;* and it would seem as though this Court had little else to do, except to permit the will of the legislature to have its effect.

I will, however, proceed to examine the grounds relied upon by the plaintiffs' counsel, in justification of taking over *seven per cent. per annum for interest.* It is said that there is no *corrupt agreement.* In the first section of the statute, and which is the section declaring the notes, &c., void, nothing is said about a corrupt agreement. The words are, that "no person or persons whomsoever shall take directly or indirectly." One would suppose, from the words used, that if a person should *intentionally* take *for interest* over seven per cent. the statute would be violated, and the security void. If it was taken through mistake, by which I mean a mistake of the fact, I should certainly not consider the statute violated. But if intentionally taken, the note is either void, or the statute for the prevention of usury is a dead letter. The will of the legislature is nothing. The idea of the necessity of our proving a corrupt agreement, which is so emphatically required of us, is derived from the English decisions, which are mere expositions of the statute of Henry the 8th. A short examination of the English statutes of usury, and a comparison of them with our own, will furnish a sufficent reason for declaring those decisions inapplicable here though I do not wish to be understood as admitting, that the manner of taking the interest, in this case, does not furnish what the Court will feel itself bound to consider as conclusive evidence of a corrupt agreement, if any such evidence were necessary.

The statute of Henry the 8th, which is the foundation of all the statutes against usury, and repealed all former acts, commences with these words: "no person, by way of *corrupt bargain,* &c., shall take, &c." The statute of 21 Jac. 1, and 12 Car. 2, were passed with a view of reducing the rate of in-

terest, leaving the statute of Henry the 8th, in all other respects, in full force. The statute of Anne reduces the rate to 5 per cent. and declares the contracts and securities for more void. These statutes being all in *pari materia*, are to be construed together; and, therefore, it is necessary, under the English statutes, that there should be a corrupt agreement.

Our statute says, "If any person shall take directly or indirectly," without saying, *by way of corrupt bargain*, "the security shall be void." The English decisions on the statute of Henry the 8th, are therefore inapplicable, owing to the manifest difference of language used in the two statutes. It may be urged, that this construction includes the man who takes over 7 per cent. by mistake. I answer no; for the man who receives over 7 per cent. not knowing that he does so receive, is not within the statute. The taking within the statute is an act of the *will* as well as the *hand*. It is not necessary that one should *agree to give*, and another *to take* over 7 per cent. to make the security void. I put a case; suppose a person, about to discount a note, should calculate interest or discount at 8 per cent.; the borrower not knowing the manner of calculating, but supposing that the interest was calculated at 7 per cent. takes the money, deducting this discount. Is not this usurious? Is not the security void, by the first section of the statute? Would it be any answer to the defence of usury, that the borrower did not agree to pay the 8 per cent.? that there was no corrupt agreement; and, therefore, that the security was not void, but good? Would it lie in the mouth of the lender to say to the borrower, "True, sir, I took for the loan of my money over 7 per cent. but you did know it at the time; therefore you did not agree to pay over 7 per cent. and, therefore, my security is good?" This is, in substance, the language of those who would urge the necessity of our proving a corrupt agreement, for the purpose of making the security void. According to this, "if the borrower had known the fact, that that he was paying over 7 per cent. then the security would be void; but because the lender had taken the excess in a secret manner, the transaction is not corrupt, and the secu-

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

rity is good.    But does not the borrower agree to pay the usury?    He agrees to pay, and does pay the sum demanded for interest.    Is not here, then, an agreement on the part of the borrower as well as the lender, provided any such agreement was necessary?    If I am not correct, the lender is permitted to say to the borrower, " because the corruption is all on my side ; because I have clandestinely taken from you over 7 per cent.; therefore I am to be put in a better situation than I could have been, provided I had acted openly and fairly."    The plaintiffs appear with an ill grace to allege the ignorance of the borrower.    Whether he was ignorant that the plaintiffs were taking over 7 per cent. does not appear, and the plaintiffs can never be permitted to make the allegation.

It has been said, that the bank did not intend to violate the statute of usury, and, therefore, the security is not void. If a bank, or an individual, will adopt *a mode of calculating interest* by which they get over 7 per cent. they can never allege a want of *intent*, on their part, to violate the statute. If they will adopt *a mode of calculating interest* which is illegal, they must be responsible for the consequences ;  for ignorance of law will excuse no man.    The very adoption of such a mode is, in law and in fact, evidence, and that conclusive too, of an intention to violate the statute, as well as of a corrupt agreement.

(s)  9  Mass.
Rep. 49.

I refer the Court to the *Bank of Maine* v. *Butts*,(z) for the purpose of showing what was there regarded as conclusive evidence of a corrupt agreement.    The defence in that case, was usury ; and the plaintffs put their right to take the sum which they had received for interest, on the usage of banks.    Sewall J. concludes his opinion in these words : " It is probable, that in this case, there was no intentional deviation on the part of the bank, but a mistake of their right.    This, however, is a consideration which must not influence our decision.    The mistake was not involuntary, as a miscalculation might be considered when an intention of conforming to the legal rule of interest was proved, but a

voluntary departure from the rate. An excess of interest was intentionally taken, upon a mistaken supposition that banks were privileged, in this respect, to a certain extent. This was, therefore, *in the sense of the law a corrupt agreement ;* for ignorance of law will not excuse." It is difficult to imagine expressions more applicable to the case at bar. They are conclusive against the plaintiffs. It is difficult to conceive how the plaintiffs could be mistaken. Yet if mistaken, it was a mistake of the law, which can excuse no man. *In the sense of the law, the taking, under such circumstances, was corrupt.* The opinion in the case of the *Bank of Maine* v. *Butts,* was given upon solemn argument, by a Court of the first respectability, and although not binding as authority. is entitled, considering the eminent legal acquirements of the members composing that Court, to great consideration and respect. The amount in controversy was sufficient to induce that Court to consider well the grounds of their decision. The opinion of the Court, in that case, undoubtedly received the sanction of the then Chief Justice of that Court, who has justly been styled the Mansfield of America.

The maxim, *ignorantia legis neminem excusat,* is founded in the clearest reason, and the most evident necessity. Civil society could not possibly exist without it. If ignorance could be alleged in justification, or in excuse for the violation of a law of general application, civil society would be at an end. This maxim is equally applicable to criminal as to civil jurisprudence. Blackstone says,(a) if a man thinks that he has a right to kill an excommunicated person, and does kill him, he is guilty of murder ; for ignorance of law can never be alleged as an excuse, even in a criminal proceeding. The intention to kill was not more evident in the case put by Blackstone, than the intention, on the part of the bank, to take this interest. If the allegation of ignorance could not avail, in the case of murder, *a fortiori,* it ought not in the case of usury. The plaintiffs in this case intended to do every thing which *the law* makes necessary to constitute the offence of usury, and yet allege their innocence. They intended to get over 7 per cent. for interest on their loans, and then protect themselves by an allegation,

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(a) 4 Bl
Com. 26.

NEW YORK, that they did not intend to be guilty of usury. If such pre-
May, 1824. tences can avail them, the whole system of legal govern-
Bank of Utica ment is subverted.
v.
Wager.          Usury or not, say the plaintiffs' counsel, is a question of
intent. In this we agree. How is this intent to be ascer-
tained? Did the lender intend to take over 7 per cent. for
interest? is the inquiry, in all cases. If he did, then is there
an end to the question of usury. This is a matter of fact, to
be submitted to a jury, and if the jury find that the excess
was taken for interest, the security is void. If they find that
the excess can fairly be referred, in the transaction, to some-
thing else besides interest, then the security is not void, be-
cause over 7 per cent. has not been taken *for interest*. It is
proved, in this case, that it was, and that, too, *intentionally ;*
and the only question is, whether such an act is usury ?
This is a question of law; or, in other words, what does the
statute to prevent usury say a man may take for the forbear-
ance of a loan of money ?

(b) 1 Bos &      In *Hammett* v. *Yea*,(b) the question was, whether the
Pull. 151. transaction was usurious. The lender had gotten more
than at the rate of 5 per cent. and whether the excess was
to be called interest, or whether it could be fairly referred to
something else, as remittance, was the question. The Chief
Justice commences by saying, " I will begin with stating my
assent to the proposition, that when a party on a contract for
a loan intentionally takes over 5 per cent. per annum for
the forbearance of that loan, he is guilty of usury. But I
add to this the further proposition, that whether more than
5 per cent. is intentionally taken upon any contract for such
forbearance, is a mere question of fact for the consideration
of the jury, and must always be collected from the whole
transaction, as it passed between the parties." If the jury
had found that over 5 per cent. was *intentionally taken for
interest*, then, according the opinion of Chief Justice Eyre,
the transaction would have been usurious. Now the very
fact which it was necessary there for the jury to find, is here
proved by the clerk of the *bank*.

Will it be pretended, that the plaintiffs have not intention-
ally taken this $18 09, when it is proved that they have been
in the habit of taking interest in the same way, upon all

their discounts, since 1812; and when all the calculations have been made according to the directions of their cashier? Will it be pretended, that any part of this $18 09 is referrible to any thing else besides interest, when their clerk swears that it was taken for interest, and when, on the trial, they contended that they had a right to take this sum as interest? Chief Justice Eyre goes on to say, "If there be any overplus after the 5 per cent. taken for discount, whether this overplus be referrible to some lawful collateral consideration or not, is a question of fact for the jury." In this case the Court considered the discounting of the bills, and the remittance of the money, as separate and distinct transactions; that is, the 5 per cent. is paid the banker as discount, and the excess as a compensation for the remittance of the money to London; and, therefore the transaction was not usurious.

*Marsh* v. *Martindale.*(c) In this case the jury found, that the plaintiffs did not intend to be guilty of usury. Lord Alvanley, Ch. J. says, "I stated to the jury, that if a man agree to take over 5 per cent. for the forbearance of money, *the law* declares such an agreement corrupt, within the meaning of the statute of Anne, *whether the party thought, at the time, that he was taking usury or not.* The finding of the jury does not prevent the Court from inquiring into the transaction, and declaring it corrupt, if it be so in point of fact." In this case the Court, believing the transaction usurious, pronounced it so, contrary to the finding of the jury. According to the opinion in this case, it is of little consequence what the lender thought about the purity of the transaction, provided it is in law corrupt. All the authorities agree in this, that whether the lender intend to take *over the legal rate of interest*, is a question of fact for the jury. Yet if the jury should find contrary to law, declaring that not usurious which in law is clearly so, the Court will set aside that finding.

*The law*, then, has fixed the intent with which a man acts, who takes over 7 per cent. for interest, deliberately and knowingly. The case explains the manner in which the excess was obtained; by calling a year 360 days, and a month 30, in all their calculations. Shortening the time

NEW YORK, May, 1824.

Bank of Utica v. Wager

(c) 3 B. & P. 153.

NEW YORK,    raises the rate ; and it would be as legal for the plaintiffs to
May, 1824.   make all their calculations at 8 per cent. as to call less than
Bank of Utica 365 days a year.  All commercial transactions prove the
   v.         year to contain 365 days, and all banks, when they wish to
Wager.        protest a note payable one year after date, consider the year
as containing 365 days.  The statute of usury speaks of
taking £7 for the forbearance of £100 for one year, and so
for a longer or shorter period.  The legislature, when they
regulated the rate of interest, had no reference to interest
for months.   The only true way of calculating is, to consider
any number of days less than a year, as parts of a year, and
take interest accordingly.  A month, in the commercial
transactions of this country, contains either 28, 29, 30 or 31
days, and this inequality of days in a month clearly shows
the impropriety of our calculating by months.  Suppose a
note payable one month after date, and dated 10th of Feb-
ruary : according to the practice of the Utica bank, they
would get the interest for 33 days, when the borrower had
the use of the money for 31 days only ; there being 18 days
in February and 13 in March, including the days of grace.
In this way, the public are compelled to pay at the rate of
7 per cent. per annum, when the money is loaned only for
336 days.  Suppose a note payable six months after date,
is discounted at the bank of Utica ; when is that note, ac-
cording to the law of the land, to be protested for the pur-
pose of fixing the endorser ? on the 185th, 6th or 7th day;
as the months may be, including the days of grace ?  If we
consider 185 days as a part of 365, as by law I contend we
are bound to do, the interest of $1000 for the time is $35.37.
If the calculation is made 30 days to a month, according to
the practice of the plaintiffs, it amounts to $35 98, and is
made up by a perfect contradiction of the principle upon
which they proceed, when they calculate time for the pur-
pose of protesting this same note.

The plaintiffs, on the trial of this cause at the circuit, in
justification of their practice, offered to prove the usage or
custom of banks.   To the introduction of this evidence, the
counsel for the defendant objected ; but his honor the pre-
siding Judge admitted the evidence subject to the exception.
This Court are, therefore, called upon to say whether this

proof of usage or custom is legal, and whether sufficient was proved, and in a proper manner, to justify the plaintiffs.

This practice of the plaintiffs is either justified by the *lex mercatoria*, or custom of merchants, or by a usage which is proved by the clerk of the bank to have prevailed for 9 years among a certain set of men, and which this Court is now called upon to sanction.

What, then, is the *lex mercatoria*, and how is it to be proved? According to Blackstone,(d) it is a particular system of customs, used only among one set of the king's subjects, " which, however different from the rules of the common law, is yet ingrafted into it and made a part of it ; being allowed for the benefit of trade, to be of the utmost importance in all commercial transactions. For it is. a maxim of law, that *cuilibet in arte credendum est.*" The law relating to bills of exchange, and all mercantile contracts, are as much the general law of the land, as the laws relating to marriage or murder. The *lex mercatoria*, or law merchant, is part of the common law of the land.

*(d)* 1   Bl.
Com. 75.

In one case,(e) the question was, whether a bill of exchange payable to order, becomes negotiable, and may be endorsed over, without the word *order* in the endorsement. On the trial at *nisi prius*, Lord Mansfield permitted the defendants to prove the usage of merchants in such a case. Witnesses were sworn on both sides. The jury found a verdict for the defendants. The plaintiffs moved for a new trial, and alleged that the proof of usage of merchants ought not to have been received, because the law was already settled. Lord Mansfield, in giving his opinion, on the motion for a new trial says, " since the trial, I have looked into the cases and thought much about it, and am clearly of opinion, that I ought not to have admitted any evidence of the particular usage of merchants in such a case. Of this I say I am now satisfied, for the law is already *settled.*" He says further, " the point now in question, has already been solemnly settled both in the King's Bench and Common Pleas, by two adjudications ; and, therefore, witnesses ought not to have been called after such solemn determinations of what the law was." Dennison and Foster, Js. concurred, for the

*(e) Edie* v
*The East In-
dia Company,*
2 Burr. 1216.

reasons expressed by Lord Mansfield. Mr. Justice Wilmot said, " the custom of merchants is part of the common law of England, and courts of law must take notice of it as such." He further adds, " if there be a doubt about the custom, it may be fit and proper to take the opinion of merchants thereupon ; yet that is only when the law remains doubtful." " Therefore," he says, " these *judicial determinations* of the point are the *lex mercatoria*, as to this question, for they settle what is the custom of merchants, which is the *lex mercatoria*, which is the law of the land. But this finding of the jury is directly contrary to the *lex mercatoria*, which is so fully settled and established by legal adjudications." The law merchant is, therefore, a part of the common law, and in order to ascertain this law, we always resort to legal decisions.

If a question respecting the law merchant has once been established by judicial decisions, these are the only evidence which Courts receive of what the law is. Any other practice would be derogatory to Courts, by rendering the wavering and unstable opinions of individuals, of greater weight and authority than the solemn and deliberate opinions of judicial tribunals.

What, then, is the custom which the plaintiffs seek to establish? They say that they have always considered a month as 30 days, and a year as 360 ; and they say that they are justified in this by the usage or custom of banks. All judicial determinations, from the earliest cases, settle the law, as applicable to bills of exchange and promissory notes, that a year contains 365, and a month 28, 29, 30 or 31 days. The law on this subject is fully established by judicial determinations; and, according to the opinion of Lord Mansfield, in the case of *Edie* v. *The East India Company*,( *f* ) no proof of usage was admissible. Can it be pretended that a year is of one length when they wish to calculate interest, and of another and different when they wish to fix an endorser by protest ? And is the same law merchant to bear them out in these two conflicting pretensions ? This is the practice which the plaintiffs gravely ask the Court to sanction, and entail upon posterity, in opposition to the known and estab

( *f* ) Id.

lished law of the land regulating time, and in the teeth too, of a statute of usury, which speaks a language too plain to be misunderstood, and whose provisions are too salutary to be disregarded.

Custom or usage may be proved for the purpose of showing that the excess, if any, was not taken for interest, but as a compensation for remittance, commissions, &c., not for the purpose of justifying the taking over the rate fixed by law. No usage can justify this,(g) any more than it could control an express contract.(h)

In the case of *Dunham* v. *Gould*,(i) the Chancellor in giving the opinion of the Court, says, " It is perfectly idle to talk of a custom of merchants to take a commission above the legal rate of interest, on the exchange of notes. Custom of merchants is not applicable to such a case. It is not matter of trade and commerce within the law merchant, and if there were such a local usage in New York, it would be null and void, and could not be set up as a pretext or cover to trample down the law of the land. The money lenders throughout the country might as well set up a practice of their own, and then plead it in bar of the statute." If the practice of the plaintiffs is adjudged good, then the practice of six or eight banks in this state will, in effect, be pleaded in bar of the statute. They will be permitted to trample down the law of the land. Lord Loughborough,(j) says, that the custom of trade to take over five per cent. (or the legal rate of interest of England) cannot authorize a greater demand than five per cent.

The language of Lord Mansfield, used in the case of *Jestons* v. *Brooke*,(k) when speaking of the case of *Floyer* v. *Edwards*,(l) will not warrant the idea that usage, be it ever so constant, would justify the taking of *usury ;* on the contrary, he expressly says it will not. The inquiry in the case of *Floyer* v. *Edwards*, was, whether the transaction was a borrowing and lending, and in this view the usage was taken into consideration.

In one case,(m) the defendant undertook to set up a custom in Southampton, that a pound should be 18 oz. The statutes of England having fixed the pound at 16, Lord Ken-

*Margin notes:*

NEW YORK, May, 1824.

Bank of Utica v. Wager.

(g) Ord on Usury, 58, 59, 60, 61. *Dunham* v. *Gould*, 16 John. 367. *Grisling* v *Wood*, Cro Eliz. 85.
(h) *Yeats* v. *Pim*, Holt's N. P. Rep. 95.
(i) 16 John. 367.

(j) *Ex parte Aynsworth*, 4 Ves. 678.

(k) 2 Cowp. 796.
(l) 1 Id. 112.

(m) *Noble* v *Durrell et al.* 3 T. R. 271.

NEW YORK, yon says this custom cannot be supported. Among other
May, 1824. things, he says, "as well might it be contended that a cus-
Bank of Utica tom could prevail in a particular place, that a certain num-
v.            ber of days less than seven should constitute a week." *Rex*
Wager.        v. *Major*,(n) was a conviction on the 23 Car. 2, for buying
(n) 4 T. R.   corn on the 23d July, 1791, at Newport, in the Isle of Wight,
750.          different from the Winchester bushel. It appeared by the
evidence set forth in the conviction, that the corn was bought
by the customary measure used in the Isle of Wight, which
contains a pint more than the Winchester measure. The de-
fendent was convicted in the sum of 30s. and £10 15, the
value of the corn. The Court, notwithstanding this strong
proof of usage or custom, sustained the conviction. In this
case, too, it appeared that subsequent acts of parliament, re-
quiring the return of corn, had noticed the custom, and re-
quired the return according to such customary measure. It
was contended that these subsequent acts had repealed the
statute, 22 Car. 2, and justified the custom. Lord Kenyon
held otherwise, and said, "we cannot get rid of these posi-
(o) 5 T. R.   tive statutes." In *Rex* v. *Arnold*,(o) the buyer in Hunting-
353.          ton, was convicted of purchasing corn different from the
Winchester measure. Lord Kenyon refers to this custom
of farmers, which existed in many parts of the kingdom,
and regrets that their obstinacy should have prevented the
operation of the statute of Charles the 2d. The defendant
was convicted, notwithstanding the proof of custom. These
are strong and conclusive authorities to show that a custom
however well proved, or however prevalent, cannot be set
up in opposition to the law of the land.

In most countries, guards have been provided by law,
against impositions upon community, in the use of false
weights and measures. This is highly penal in our own
(p) 1 R. L.   state,(p) and the offender, in public estimation, is justly
376, 379, s. 12. considered infamous. Courts of justice have always been
rigid in enforcing these statutes, inflicting punishment for the
most trifling violation. Why was this? The reason is ob-
vious; because weights and measures are of constant and
daily use in our dealings with one another, and because the
frequent use of the same false weight or measure would

enable its possessor to commit extensive injury upon his customers. That the variation is small, while it manifests a meaness in depravity, has a tendency to shield the offender from punishment. The injury becomes great by repetition. An extensive merchant, by little and little, filches property from his customers, by the use of false weights and measures. What would Courts of Justice say to such a merchant, who, when indicted should, as the plaintiffs have done in this case, plead the extensiveness of the practice. Would they not say, that "*the law, and not the practice of others is to be your guide*, and what you offer in justification shows, if true, the necessity of an immediate corrective." For the purpose of showing what usages are good, and how far they are to operate when proved, and the manner of proving them, I refer the Court to the cases of *Thomas* v. *Graves and Toomer*,(q) *Same* v. *O'Hara*,(r) *Cotton* v. *Johnson*,(s) and *Trott* v. *Wood*.(t) Errors merely acquiesced in, do not constitute the law. In *Leach* v. *Pargiter*,(u) the practice under the Lord's act, had been one way for 30 years, but was altered the first time the statute came under the consideration of the Court.

In *Butt* v. *Conant*,(v) speaking of usage, Dallas, Ch. J. says, "if the practice were against the first principles of constitutional law, and an evident encroachment upon the rights of the subject, I would go even the length of saying, if it were of this discription, and were sanctioned by the expressions of one of the Judges, in such a case I would not hold it to be law if it had existed from the foundation of Rome."

A custom contrary to public good, or injurious to a multitude and beneficial only to some particular persons, is repugnant to the law of reason, and consequently void.(w) The Judges say, in things against law and reason, *usage* is to no purpose.(x) Customs ought to be beneficial to all, but may be good when against the interests of particular persons, if for the public good.(y) A custom that begins by the extortion of lords of manors, is judged wanting a lawful beginning, and therefore void(z)

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(q) 1 Rep.
Con. Court of
S. C. 308.
(r) Id. 303.
(s) 3 Salk
110, 111.
(t) 1 Gall
Rep. 443.
(u) Doug. 68
(v) 1 Brod
& Bing. 548

(w) Danvers,
424, 427.

(x) Plowd
170.

(y) Dyer, 60

(z) Plowd
332. Dyer, 199

NEW YORK,    The case of *Rex* v. *Major*,(a) also shows that statutes
May, 1824.   passed after the existence of the custom or usage is known,

Bank of Utica and in some measure sanctioning them, by authorizing re-
v.           turns according to the custom, do not affect a general law
Wager.       in relation to the same subject.  If the legislature knew, at
(a) 4 T. R.  the time they incorporated the plaintiffs, that banks were in
750.         the habit of calling 360 days a year, when calculating inter-
est, this case shows that such a circumstance will furnish no
argument for exempting them from the operation of a per-
manent and plain law of the land.  In the language of Ld.
Kenyon, they cannot *get rid* of the operation of such a po-
sitive law as the statute of *usury*.  The convictions under
the corn laws, were upon penal statutes, where the utmost
strictness is observed in construction, and the greatest lati-
tude allowed in defence.  They go to prove, beyond all con-
troversy, that, on an indictment, against a natural person,
the facts shown in this case would ensure his conviction.

The Court will find, if they examine the acts incorpora-
ting the different banks in this state, that most of them are
restricted in their discounts, to six per cent. and those in the
city of New York, which are not so restricted, usually con-
fine themselves to that rate, otherwise they could not do busi-
ness.    Now a bank that takes at the rate of 6 per cent. may
call any number of days less than 365 a year, and calculate
interest accordingly, provided they do not get over 7 per
cent.   The undoubtedly violate their charter, but are not
guilty of usury.

It may be supposed, that the amount received was too tri-
fling for the notice of a Court of Justice, and that judgment
would therefore be given for the plaintiffs.   I will not for a
moment entertain the idea that such a supposition is cor-
rect.   The statute of usury must be protected from the most
trifling violations, or not at all.   The legislature have set
bounds to the unfeeling and avaricious lender, which he is
not to pass with impunity ;  and that Court is guilty of
treachery to the public, that does not confine him within
legislative limits.   The Judge would ill deserve a seat up-
on the bench of justice, who should let his decision be at all
influenced by the amount which the violator of the statute

had received.   If 26 cents can be received upon the statute with impunity, so can 26 dollars, and there is nothing to be done by a Court of Justice but rigidly to adhere to the rate fixed by statute.   In the case of *Rex* v. *Major*,(*b*) the difference between the two measures was trifling, and yet no one ever thought of urging that as an argument in favor of the defendant's acquittal.   I challenge gentlemen to point out a case where the amount received has ever been taken into consideration, for the purpose of deciding whether the transaction was usurious.   If the amount exceeds the rate fixed by statute, it is usurious ; no matter how trifling the excess.   The cases authorizing the taking of interest in advance, may be cited for this purpose.   I was aware of the case of *The Manhattan Company* v. *Osgood*,(*c*) cited on the other side, and I am also aware that that decision is not supported by the authorities relied on.   Yet if that case is introduced for the purpose of showing that the violations of the plaintiffs are to be sanctioned, it proves too much ; for we then have no statute of usury at all ; and if this is the extent to which that decision is to lead, I trust this Court will pronounce it not law.

Something has been said, and more probably will be, in regard to the consequences of a decision against the plaintiffs.   This is an argument seldom resorted to when other substantial grounds can be taken.   It *is* generally the last, and with parties situated like the plaintiffs, the most desperate effort.   Such arguments, however, can never assist any person in arriving at the truth.   In the case of *Waters* v. *Stewart*,(*d*) Chief Justice Spencer, in giving his opinion in the Court of Errors, says, " arguments *ab inconvenienti* have been suggested.   There can scarcely exist a case, however well settled, where such arguments cannot be urged.   They prove nothing, and should be listened to only in *doubtful cases*."   In the case of *Langdon* v. *Potter and others*,(*e*) Chief Justice Parsons says, " arguments drawn from inconvenience, are to have weight only in *doubtful cases*."   In the present case nothing is doubtful.

Private statutes, made for the accommodation of particular citizens or corporations, ought not so to be construed as

**NEW YORK,**
May, 1824.

Bank of Utica
v.
Wager.

(*b*) Id.

(*c*) 15 John.
162.

(*d*)   Caines'
Cas. Err. 66.

(*e*)  3 Mass.
Rep. 593.

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(f) Coolidge
v. Williams, 4
id. 145.

to affect the rights or privileges of others, unless such construction results from express words or necessary implication.(f)

It may be well, perhaps, since arguments ab inconvenienti have been used for the plaintiffs, to turn the attention of the Court, for a moment, to the consequences of a decision against the defendant. The plaintiffs by calling 360 days a year, have, ever since their incorporation, made every 73d dollar of discount over 7 per cent. The only true way of testing the operation of any practice is, by viewing its consequences for a long course of years, and for the purpose of showing this, I have made a calculation, giving its effect upon one million of dollars for a century. By this calculation it will appear, that in a century, over twelve millions of dollars will be illegally taken. This makes an annual average of 120,000 dollars. The circulating medium of the United States is probably not far from 150,000,000. The amount of the annual average which would be thus illegally taken, upon the principle contended for by the plaintiffs from the whole United States, over and above 7 per cent. would be 18,000,000. The inconsiderable sum which will probably be lost by a judgment against the plaintiffs, compared with the enormous tax which will certainly be entailed upon community by a contrary decision, sinks into utter insignificance. The amount which will be lost to the plaintiffs, will, in all probability, fall far short of what they have illegally taken; and it is of immense importance to a growing commercial country like ours, that questions of this sort should be settled upon true principles. If we were compelled to make our loans from foreigners, upon the principles contended for by the plaintiff's counsel, the effect would be utter destruction. In a very short time the whole wealth of the country would be exhausted by such illegal exactions. Compared with such a state of things, the paltry tax upon tea, which contributed to produce the revolution, would have been insignificant indeed. The restrictions against usury are founded on the strongest reasons of policy and morality; they have, therefore, been imposed in almost every age and country. It is no law of doubtful policy or ex

pediency which you are called upon by the defendant to enforce. It is a law which the greatest and the best of Judges have felt bound to watch with unceasing vigilance, guarding its provisions from the most trifling infractions, and enforcing its penalties fearless of consequences. It is a law which our very nature renders necessary, and which has been hallowed by the sanction of accumulated ages. It is not like some exploded edict of despotic power, preserved as a pretext for plunder and oppression. It is one of the few restraints which, in the most corrupt times, have always been placed, even by the very worst rulers, upon the rapacity of the worst part of community, for the protection of the poorest. It is prohibited by the common law, and the punishments inflicted for its restraint have been rigorous and severe. It is laid down in the books as a sound rule of construction, and in some cases by legislative enactment, that the statute shall, in all cases, be construed most strongly against the usurer. Though the borrower was formerly considered a *particeps criminis*, that idea is now justly exploded, considering that he is in the power of the lender, and necessarily submits to his terms. The desire of gain insensibly vitiates the heart. It was, therefore, wise for governments to erect a shield over the weaknesses, and a check upon the passions of men, to protect those oppressed with pecuniary embarrassments from the depredations of unfeeling avarice, and to guard weak and unfortunate individuals from the fangs of the Shylock. All privileged associations should be watched with Argus eyes. They should be regarded with distrust. It is the duty of Courts to keep them within the bounds prescribed by the legislature. They are opposed to the genius of our government, and if tolerated, should not be permitted to abuse the privileges with which they are entrusted.

These considerations apply with peculiar force to incorporated banks. Drawing around them, as they evidently do, a silent yet powerful influence in the neighborhood where they are situated, they will ever be watched with jealously by a people alive to their rights and liberties. Banks being granted for the express purpose of loaning mo-

ney, the rule of construction of the statute of usury will not be softened in their favor. If the principle contended for by the opposite counsel be correct, what salutary statute can hereafter stand against the usages of trade ? What law can hereafter be enacted, which may not be trodden down by the custom of banks.

*D. Cady*, in reply. It is certainly well settled by the authorities cited in the opening, that to constitute usury, so as to avoid the security, there must be a corrupt agreement. No case has been produced to the contrary. If this be necessary, then, in order to constitute the offence with which we are charged, we must have had an associate. It is difficult to conceive how there can be a corrupt agreement, without there being two parties. These are essential to every contract. Who is the person with whom we have made the corrupt bargain charged upon us ? Not the defendant. He disavows it. It is denied that he knew any thing of the usury, till some time after the note in question was discounted; and his counsel complain that he has been practised upon from the beginning, without knowing any thing of the imposition. All is a recent discovery.

Now I propose to show conclusively, that there never was a case of usury without the concurrence of two parties. *Smith* v. *Beach*,(*g*) is a respectable authority to this point, and will be found to accord as well with the spirit of all the cases, as with reason and common sense. The point there directly decided, was that a corrupt agreement, in which the minds of the parties meet, is necessary to constitute usury; and, therefore, where more than lawful interest was reserved, with the knowledge of the lender, but without the knowledge of the borrower, it was held that the transaction was not usurious. The reasoning of the Court is directly applicable to this case, and, if it be law, is conclusive in favor of the plaintiffs. " A corrupt agreement (they say) is essential to constitute usury; and, to form a corrupt agreement, as in all other contracts, the minds of the parties must meet. The assent of Beach (the defendant) was, therefore, as essential to the existence of an usurious agreement.

(*g*) 3 Day's
Cas. 26.

as that of Bird, (the plaintiffs' testator.) From these premises it follows, as an undeniable consequence, that there could be no corrupt agreement, while either of the parties remained ignorant of the excessive reservation; and the jury ought to have been so instructed." It will be seen, by that case, that the Connecticut statute is the same, in substance as our own. The same arguments were urged as here, against the necessity of a corrupt agreement. It was said to be enough that the lender voluntarily made an usurious reservation; and of the fact that he did so there was no dispute: but the law was denied by the Court. The ignorance of the borrower precluded the possibility of an agreement.

The several provisions in the 1st and 2d sections of the statute of usury,(h) show, that the distinction between the two cases, of a corrupt agreement and the receipt of excessive interest by the lender without the concurrence of the borrower, was intended to be kept up by the legislature. The 1st section provides for the case of taking excessive interest for the forbearance of money, or reserving it by certain contracts or securities. If so taken or reserved, the contract or security is declared void. The contract itself is vitiated by the corrupt agreement. The second section was intended to provide for taking usurious interest, in the same way, and it gives the remedy. Within one year the borrower may recover back the excess. If not knowingly paid, the statute could never have intended to confine him to the year. If ignorantly paid, he has the six years, and might recover it back, upon the general principle, that it was money paid through mistake or fraud. It stands on the same footing as money twice paid on a note by mistake. Suppose an illiterate man to borrow $100, and the lender fraudulently draws, and procures him to sign a note for $105. This would not be void for usury, but for fraud; whereas, if the lender should say, I must have $105, and the borrower then should sign a note for that sum, it would be void for usury. If gentlemen are willing to abide by their own admissions, the case is against them. They are loud in urging the entire ignorance of their client that any excess was de-

(h) 1 R. L. 64.

manded; and, indeed, this is plain from the proof, if the con cession had not been made. The defendant never thought of an usurious contract. It was made out by calculation and inference. The note is presented and the money received, silently, in the ordinary course of business, without dreaming of usury. Neither Maynard nor Spencer were authorized to part with the notes at an usurious rate of discount. The circumstances under which the second note was discounted are not explained; but, as to the first and second, both parties agree that the defendant acted unwittingly. If the agent had sworn that he paid $40 excess, without knowing what he was about, it might have been recovered back within 6 years, in an action for money had and received, upon general principles, but the note would not be void for usury.

The first counsel for the defendant conceded, that if the second note was valid, we may recover for that. If void, we may go for the first, if that be good. Upon the latter, it is said we took interest for three days, which it had already run when presented for discount; but was it not, to all legal purposes, discounted on the 12th of September. It was carried for discount on that day, and on an objection being made to the form of the note, another was afterwards substituted in an acceptable shape, which was actually discounted upon the 15th. The money was, then, virtually set apart for this purpose upon the 12th. There was a proposition to do it, which was afterwards executed. Take the case of a request for a loan in the morning, and the money laid apart for the purpose, but not actually counted out till the next day, when the loan is completed: would it not be iniquitous to object usury? The Court are called upon to presume what the contract was; for none of an usurious nature is shown; and they will not make a presumption which shall involve the party in guilt.

But what is the legal date of a note? It is the time of delivery.(i) This was on the 15th of April, when a discount for 90 days was rightly taken; for it had that time to run. Had an action been prosecuted before the expiration of that time, it would not have lain. The Court would rather presume this to have been the contract, than impute the crime

(i) Lansing
v. Gaine &
Ten Eyck, 2
John.    Rep
300.

of usury. Suppose the note had been ante-dated a year, by mistake, and the discount for a quarter taken. The Court would still say to the holder, " your engagement was to wait the 90 days, for which you may take the discount; but cannot sue before the expiration of the time."

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

It is said, that our miscalculation was intentional; but this is not necessarily so. Will the Court presume it? The division of time is of human invention; and there is no such absolute certainty and plainness in measuring, as to preclude mistake. We are told that the statute speaks of a year, or a longer or shorter time, and that quarters and months are not taken into account; but we are not informed what operation to adopt, in order to reach the law of less than a year. You divide 365 days by 12, if you are seeking for a month, and reject the fractions. This gives a quotient of 30, which multiplied by 3 gives 90 days, or a quarter of a year, if fractions are still to be disregarded. Upon this principle, on a 60 day's loan, you get the interest for a year, and divide by 6.

But suppose 90 days are improperly called ¼ of a year: on looking at the calculation, the Court will see that the interest is calculated for 90 days, excluding the first or day of the date, which was also the day of the lending; so that, in truth, the only question is, whether the lender is entitled to interest on the day upon which he loans the money. Is it to be tolerated, that we are to forfeit our security for the whole sum, merely because we have charged interest for the first day? Will the Court say, that because the calculation happens to cover that day, that so small a mistake, even if it be one, shall overturn the whole demand? But is it a mistake? Every law book, speaking of time, tells us that fractions of a day are to be rejected. This is an established general rule, and only to be departed from when it becomes material to inquire beyond it, upon principles of necessity, or for the sake of equity. Are we to be stigmatized as usurers on such a ground as this?

It was not our fault that we discounted the second note before the first had run out; though be this as it may, it could not change the character of the first note. But such a transaction is not usury, even if it is to be deemed a con-

tinuation of the first.   The party was under a necessity of obtaining a discount of his note thus early, in order to comply with the course of business which is universal at the banks throughout the commercial community.   It was in reference to the discount days, which cannot be so regulated as to meet the views of individuals.   Upon the question (j) 4 T. R. coming up in *Brown* v. *Harraden*,(*j*) whether 3 days of grace are to be allowed upon a promissory note, Ld. Kenyon gives great influence to the universal practice which (k) Id. 153. prevailed on this subject.   He says,(*k*) " in addition to these considerations, we are now told that it has been the constant practice at the bank, and at the principal bankers, to make this allowance on promissory notes.   Then, if we were to make a decision in opposition to all this practice, it would be attended with the most serious consequences ; for these notes are circulated not only throughout this country, but also over several other countries of Europe.   Many of them have been discounted, and interest taken, on the supposition that 3 days of grace are allowed.   But if we were to determine that no such allowance ought to have been made, all those parties would be involved in the crime of usury."

This case goes, moreover, to show the weight which is given to arguments *ab inconvenienti*, upon these commercial questions.   The consequences, to be deprecated are, the overthrow of floating paper, which has always been supposed to be good, and the involving thousands of innocent men, who never dreamed that they were taking excessive interest, in the crime of usury.

We accede the distinction made between mistakes of law and mistakes of fact.   Knocking a man down in the street, or shooting at him, and taking his life, will constitute murder, whether the offender knows that it comes within the legal definition of this crime or not.   But the two cases of *Brown* v. *Harraden*,(*l*) and *Glassford* v. *Laing and others*,(*m*) furnish a complete illustration of the distinction between a mere mistake of the law, and the one insisted upon in this case.   We claimed the right to have the first day upon each note included.   This is the mistake, if it can be called one

(j) 4 T. R. 148.

(k) Id. 153.

(l) Id.
(m) 1 Campb. Rep. 149.

We intended no more than 7 per cent. for the whole time; and the mistake of including the first day was one of fact merely.

·Floyer v. Edwards,(n) was cited in order to show that the intention of the parties is material ; that they must both concur in the bargain ; and the Maine Bank v. Butts,(o) with the same view. No mistake, in these cases, was pretended. There could be none. The latter was of notes palpably usurious. It was the case of taking two distinct notes for the same money. A note is taken, say for the principal, at three years : other notes are taken for a part of the same sum, at the same time, at shorter dates. This is the case of the Maine Bank v. Butts, yet the question of intention was left open to be referred to a jury ; and that question is always involved, where a party is on trial for a crime. There are certain offences to which knowledge is essential, and must be averred in an indictment. The crime of passing counterfeit money is one. Usury is another. The intention of the parties is here the git of the inquiry, and must always be left for the jury to pass upon. A man takes 8 per cent. ignorantly : unexplained, it would be usury. If shown to have been accident, it would be otherwise. Thus, even in ·the Maine Bank v. Butts, the act of taking the smaller notes was open to explanation, and the prima facie case, made out by the defendant, might have been done away, by proof on the other side.

It is complained, that our calculations were made in secret ; that the business was so managed that they could not be comprehended by the borrower. But what ought the Court to infer under all these circumstances ? Here is plainly room for mistake. What should the presumption, be ? Glassford v. Laing and others,(p) and Buckley v. Guildbank,(q) are strong cases to show that where the Court can infer a mistake in taking the excess, they will do it, in order to avoid imputing the offence of usury. Taking a trifling excess beyond the legal interest, according to an extensive practice among money lenders, is a subject also of this rule of presumption in favor of innocence. "Thus, Lord Mansfield, in Floyer v. Edwards :(r). "Upon a nice calcula-

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(n)    Cowp.
112.    Lofft,
596, S. C.
(o) 9 Mass
Rep. 49.

(p) 1 Campb.
N. P. Rep. 149
(q) Cro. Jac.
678.

(r) 1 Cowp
115.

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

(s) 15 John.
162.

tion it will be found, that the practice of the bank in discount-ing bills, exceeds the rate of five per cent. for they take inte-rest for the whole time the bills run, but pay only part of the money, to wit, by deducting the interest first; yet this is not usury." The *Manhattan Company* v. *Osgood,*(s) was decided upon the same principle.

If gentlemen object to our rule of calculation, they ought to have supplied us with a better. The practice of calling 60 days $\frac{1}{6}$ of a year, in calculating interest, has prevailed for a great length of time; and, with a perfect knowledge of this practice, it will be seen that almost every act for in-corporating banks refers to 60 day notes. Being the most usual kind of bank paper, and understood in the long con-tinued practice of the commercial world to mean $\frac{1}{6}$ of a year, is it too much to say that the legislature referred to them in this character? Indeed, they are, as we have shown, in fact, $\frac{1}{6}$ if you take them as the aliquot part, and reject the fraction.

It was not usurious to discount the 2d and 3d notes be-fore the ones for which they were substituted fell due. If there had been an orignal express agreement to this effect, it would have been another question; but the existence of any such agreement is negatived by the proof.

SUTHERLAND, J. The note on which this suit was brought, bears date the 14th of March, 1821, and is payable in 90 days after date. It was presented at the bank, on the 15th : $18 09, paid as the discount and interest upon it. It fell due on the 15th June. The interest was calculated as in the case of the *New York Firemen Insurance Company* v. *Ely & Parsons,*(a) upon the principle that 90 days were the fourth of a year. This note was the second renewal of one, dated the 12th of September, 1820, and discounted by plaintiff at 90 days. The interest was calculated upon the same principle, and the same amount received upon this and the second as upon the last note.

(a) Ante, 678.

It is unnecessary to consider the various points which were discussed in this case. There is nothing to take it out of the operation of the principle established in *The Firemen*

*Insurance Company* v. *Ely & Parsons ;* that this mode of calculating the interest, renders the transaction usurious.

WOODWORTH, J. concurred.

SAVAGE, Ch. J. To determine whether a contract is usurious, we must inquire,

1. Whether the subject of the contract is a loan ?

2. Whether more than lawful interest has been received or taken ? and

3. Whether it is the effect of a corrupt agreement ?

In this case, there is no dispute upon the first question. It is denied, however, by the plaintiffs, that they have taken more interest than they were entitled to receive.

The statute is very explicit, that no more than 7 pounds shall be taken for the loan of £100 for one year, and so after that rate for a greater or less sum, or for a longer or shorter time. The sum of $18 09, was received by the plaintiffs for the loan of $1000 for ninety-three days, and both the witnesses who have testified on that subject, have sworn that the interest on $1000 for that time, at 7 per cent. calculating 365 days to a year, amounts to $17 83 5. The fact is proved, then, that more than 7 per cent. has been received ; and there is no pretence that it was taken by way of commissions or incidental charges. The custom, which is said to be universal, for all moneyed institutions, to calculate interest on 360 days as a year, can have no weight. It would be strange indeed, if the practice of any set of men, or companies of men, should become paramount to the authority of the legislature. With respect to most of these banks, who are said thus to calculate, it is well known that their loans are made at 6 per cent. ; and although they receive more than six, yet the difference is not such as to amount to a violation of the statute against usury. Hence, perhaps, it is, that the custom has prevailed so generally. The excess amounts to a very little less than one tenth of 1 per cent. To an individual borrower, it is very trifling : to a bank, however, having an active capital of $500,000, this pittance will produce $500 per annum, and upon the whole active banking capital of the state, according to the the report of the Comptroller, it would produce $13,000.

NEW YORK, May, 1824.

Bank of Utica
v.
Wager.

The amount, therefore, is too large to be entirely disregarded, because *de minimis non curat lex*.

Again; it is alleged, that the plaintiffs have received interest for three days more than the true time included in the notes; that is, they have received interest on $1000 for 279 days; whereas the number of days from the 12th of September, 1820, to the 15th of June, 1821, reckoning one of these days inclusive, and the other exclusive, is 276 days only. So is the fact. The plaintiffs have, therefore, received the interest of those three days, at the rate of 14 per cent. per annum; for the second note was a renewal of the first, and the third a renewal of the second. Yet there is no evidence, showing that when either the first or second note was given, there was any stipulation for their renewal. The Clerk, who keeps the books of the bank, swears that each note was discounted on the day of its date; that on this being done, the proceeds were deposited to the credit of the person for whose use the discount was made; and if he chooses to make a deposit several days before his note falls due, surely the bank ought not to be holden guilty of usury for receiving it, unless the transaction clearly appears to be a cover for usury, as in the *Maine Bank* v. *Butts*, (9 Mass. Rep. 49 to 55.) In that case, a loan was made of $10,000, payable part in 2 years, and part in 3 years. It appeared to be the practice of that bank, to take notes payable in 63 days; and a week previous to the expiration of such notes, the borrower obtained a new loan of the same amount with which to meet the former. In that case it seems to have been part of the original contract, that the borrowers of money from that bank should pay interest for 70 days for every loan of 63 days; and there was reason to believe that the interest on the loan to Butts had been calculated on those principles, as the small notes given for the interest, greatly exceeded its lawful amount. It seems to have been supposed by the bank, also, that being authorized by their charter to transact business on *banking principles*, they were, thereby, exempt from the restrictions of the act to prevent usury. Judge Sewall, who gave the opinion of the Court, referring to the practice of renewing a

note several days before its expiration, observes, that, " while
each note sustains a discount or deduction at the established
rate of interest only, there is no offence against the statute
for the prevention of usury." This doctrine must certainly
be admitted, with the qualification, that these renewals
must not be used as a cover for usury. In the case under
consideration, the renewals appear to have been made as
near as possible to the time when the previous note became,
due, having regard to the established days of discount at
the bank. Had more than one discount day intervened be-
tween the discount of the second note and payment of the
first, the transaction would certainly have carried suspicion,
at least, upon its face.

The objection that interest was taken for several days
between the date and the discount of the notes, or some of
them, does not appear to be supported by the facts. The
testimony is contradictory on the subject; but I think we
ought rather to give preference to the Clerk of the bank
who does not depend upon his memory, but upon entries
made in the books of the bank at the time. In this respect
we are performing the office of a jury, and ought not to be
unnecessarily astute in detecting small unintentional errors,
to defeat the recovery of a just demand. In making this
remark, I mean not any reflection on the justice or policy
of laws prohibiting usury. On the contrary, I believe such
laws perfectly just and proper. They are necessary to
protect the necessitous against their own acts of indiscretion.
Nor would I impute moral guilt to those who receive more
than the legal rate of interest, provided their exactions do
not become oppressive. Usury is *malum prohibitum*—
not *malum in se*. I am aware, that by some ancient
English statutes, all usury was prohibited, as being against
the law of God, the laws of the realm, and the law of
nature. It was tolerated, however, by the law of Moses;
and allowed to be taken by Jews from the Gentiles; (Deut.
xxiii. 20;) and, therefore, could not have been immoral in
itself. The stat. 37 H. 8, c. 9, (A. D. 1546,) was the first
statute of England, which permitted interest to be taken;

and 10 per cent. was allowed. This statute was repealed in 1551; but revived by the 13 Eliz. c. 8, (A. D. 1570,) 10 per cent. was again the lawful interest; and by this act, contracts, assurances, &c. whereby above 10 per cent. should be reserved, or taken for money lent, are made void. In 1623, the rate of interest was reduced to 8 per cent.; in 1660, to 6 per cent.; and in 1713, by the 12 Anne, c. 16, to 5 per cent.

. There is nothing in the objection, that interest was taken for the three days of grace; for though the maker might have chosen to pay his note on the day when payable, yet the holder could not compel payment till after the expiration of the days of grace. To every practical purpose, therefore, the days of grace are part of the note itself.

' Another objection (handed to the Court among the written points, but upon which we refused to hear an argument) is, that it was usurious to take interest in advance without regard to the rules of rebate or discount.

Were the question upon this practice *res integra*, I should think it a palpable violation of the statute. The bank lends a man $1000 for a year, but actually advances him $930 only: the other $70 they lend to somebody else, and deduct the interest again. But for the purpose of the present illustration, I will suppose the whole $70 lent. At the end of the year, then, they receive from the first borrower their principal, $1000; from these cound borrower, £74 90; making an excess of $4 90, beyond legal interest, which on a capital of $500,000, will produce $2450. On the other hand, if the borrower puts his $930 out at interest, he will have at the end of the year, $995 10 only, with which to pay the $1000 borrowed. He therefore loses $4 90; which the bank gains beyond the lawful interest; whereas if they were to retain the *discount* instead of the *interest*, the borrower would receive $934 58; the interest of which is $65; 42, giving him his $1000 at the end of the year. The bank, by again lending the discount, ($65 42) would receive, at the end of the year,

1. The whole amount of the loan,                    $1000 00

| | |
|---|---|
| 2. The discount on $1000, | 65 12 |
| 3. The interest on $65 42, | 4 58 |

Making in all, .        $1070 00

being the sum loaned with 7 per cent. interest. Those banks who lend at 6 per cent. may safely adopt the practice of retaining the *interest* instead of the *discount ;* as the difference does not amount to quite half of 1 per cent. ; they, therefore, do not violate the act to prevent usury.

Plain as this case appears to my mind, it has been solemnly adjudged not to be usurious, both by this Court, (*The Manhattan Company* v. *Osgood,* 15 John. 168,) and by the Supreme Court of the United States. (*Fleckner* v. *Bank of the U. S.* 8 Wheat. 838.) Both Courts found their decision upon the practice of bankers and commercial convenience. Judge Story, in giving the opinion of the Court, (8 Wheat. 354,) observes, that an authority to make discounts, means an authority to receive the interest in advance. The same doctrine has been recognized in Pennsylvania (*Pawling's Exrs.* v. *Pawling's Adms.* 4 Yeates' Rep. 220, 223 ;) and in Massachusetts, (*Maine Bank* v. *Butts,* 9 Mass. Rep. 49.)

The point may, therefore, be considered settled until the legislature alter it, if they should think it proper or necessary ; but as the old adjudications were different, it may be matter of curiosity, at least to trace its history. The oldest case which I have found where this doctrine was discussed, is *Barnes* v. *Worlich,* which is reported in Cro. Jac. 25 ; Moor, 644 ; Yelv. 30 ; Noy, 41 ; and 1 Bulstr. 20. These reporters disagree in some particulars ; but they all concur in the point, that deducting the interest out of the loan, at the time when it was made, would be usurious, because the borrower would not have the use of the whole money for the year. The question before the Court, was, whether a reservation, in the contract, of interest half yearly was usurious ; and it was decided that it was not, though some of the Judges thought even that was usurious. This decision took place before the statute of Anne, and in the 43 or 44 Eliz. (about A. D. 1600.) The first case in which I have found a contrary *dictum* is *Lloyd* v. *Williams,* (2

NEW YORK,
May, 1824.

Bank of Utica
v.
Wager.

W. Bl. 792,) which was an action on the statute of usury for the penalty. The defendant had taken £6,5, by way of advance for £100 ; and to determine whether the action was brought in due time, the question before the Court was, whether the offence was complete on receiving the £6,5, or not till the final payment of the note. The Court decided that the offence was complete on receiving the £5,5 ; and Blackstone, Justice, said, " that interest may as lawfully be received beforehand for *forbearing*, as after the term is expired for *having forborne ;* and it shall not be reckoned as merely a loan of the balance. Else every banker in London, who takes 5 per cent. for discounting bills, would be guilty of usury ; for if upon discounting a £100 note at 5 per cent. he should be construed to lend only £95, then, at the end of the time, he would receive £5 interest for the loan of £95 principal, which is above the legal rate." This case is very fully reported in 3 Wils. 250 to 262, where the latter point is noticed by the Court, who declare that " *Worley's case,*" (S. C. as *Barnes* v. *Worlich,* in Cro. Jac. and other Reporters,) " Moor, 644, shows that taking interest out of the principal, when it is first advanced and lent, is usurious, and contrary to the statute, and 1 Bulstr. 20, upon an information on the 13 Eliz. c. 8, for usury, S. P." It appears that Blackstone, J. was not present when judgment was pronounced. The opinion was given by De Grey, Ch. Justice. This case was decided in 1771 ; and taking the two reports together, it appears that De Grey, Ch. Justice, and Blackstone, J. differed on the point now under consideration.

The case of *Floyer* v. *Edwards,* (Cowp. 112,) was next in point of time, being decided in 1774. That was an action for goods sold at 3 months credit, with an agreement that if the money was not then paid, the defendant should pay an half penny an ounce per month, till paid. This exceeded lawful interest ; but was decided not to be usurious upon the usage of trade among gold refiners, to which the parties belonged ; and Lord Mansfield observes, that, " upon a nice calculation, it will be found that the practice of the bank in discounting bills, exceeds the rate of 5 per cent. ; for they take interest upon the whole sum for the

whole time the bills run, but pay only part of the money, viz. by deducting the interest first; yet this is not usury." The same point is adjudicated in 1787; (*Auriol* v. *Thomas*, 2 T. R. 52, & *Winch, q. t.* v. *Fenn*, n. (*c*) to that case;) and in several cases, subsequent to that time, in which, not only 5 per cent. interest was allowed to be deducted at the time of the loan; but also commissions and other charges, where the nature of the transaction is such as to render them proper. (1 B. & P. 143, and the cases there cited.)

NEW YORK, May, 1824.
Bank of Utica v Wager.

This privilege of deducting the interest by way of discount, I apprehend, is confined to bankers, and those who deal in bills of exchange or promissory notes, by the way of trade. This is so, at least in England. In *Marsh* v. *Martindale*, (3 B. & P. 154,) the late plaintiff discounted a bill of exchange payable in 3 years, for £5000, and deducted the 3 years interest, £750. This was held to be usurious upon the authority of *Barnes* v. *Worlich*, and *Dalton's case*, (Noy, 171,) Lord Alvanley, Ch. J. justifies taking the interest in advance on bills of exchange, which he admits to be more than the legal rate, and adds, " In such cases, the additional sum seems to have been considered in the nature of a compensation for the trouble to which the lender is exposed."

On the whole, therefore, I am of opinion, that the objections to the amount of interest, and the mode of transacting the business of the bank, are none of them tenable except the first, to wit, calculating upon 360 days as a year. This mistake cannot be called involuntary. There is no pretence of ignorance or inadvertence. It is a direct violation of the statute; and if Courts permit moneyed institutions thus to go on making one encroachment upon another, the statute against usury will soon become a dead letter.

That the receiving usurious interest intentionally, *is* sufficient evidence of a corrupt agreement, does not need an authority to support it.

In my opinion the defendant is entitled to judgment.

Judgment for the defendant.